RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 20a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

EMW WOMEN'S SURGICAL CENTER, P.S.C., on behalf of itself, its staff, and its patients; ERNEST MARSHALL, M.D., on behalf of himself and his patients,

          *Plaintiffs-Appellees*,

PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC.,

          *Intervenor Plaintiff-Appellee*,

    *v*.

ERIC FRIEDLANDER, in his official capacity as Secretary of Kentucky's Cabinet for Health and Family Services; ANDREW G. BESHEAR, Governor of Kentucky, in his official capacity,

          *Defendants-Appellants*,

DANIEL J. CAMERON, Attorney General of the Commonwealth of Kentucky,

          *Intervenor*.

No. 18-6161

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:17-cv-00189—Gregory N. Stivers, District Judge.

Argued: August 8, 2019

Decided and Filed: October 16, 2020

Before: CLAY, LARSEN, and READLER, Circuit Judges.

_____

## COUNSEL

**ARGUED:** S. Chad Meredith, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellants. Easha Anand, ORRICK, HERRINGTON & SUTCLIFFFE LLP, San Francisco,

California, for Appellee Planned Parenthood of Indiana and Kentucky, Inc. Brigitte Amiri, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, for Appellees Women's Surgical Center, P.S.C. and Ernest Marshall, M.D. **ON BRIEF:** S. Chad Meredith, M. Stephen Pitt, Matthew F. Kuhn, OFFICE OF THE GOVERNOR, Frankfort, Kentucky, for Appellants. Easha Anand, Karen G. Johnson-McKewan, ORRICK, HERRINGTON & SUTCLIFFFE LLP, San Francisco, California, Carrie Y. Flaxman, PLANNED PARENTHOOD FEDERATION OF AMERICA, Washington, D.C., Michael P. Abate, James E. McGhee, KAPLAN JOHNSON ABATE & BIRD LLP, Louisville, Kentucky, Lisa T. Simpson, Jennifer M. Keighley, ORRICK, HERRINGTON & SUTCLIFFE LLP, New York, New York, Melanie L. Bostwick, ORRICK, HERRINGTON & SUTCLIFFE LLP, Washington, D.C., Robert L. Uriarte, ORRICK, HERRINGTON & SUTCLIFFE LLP, Menlo Park, California, for Appellee Planned Parenthood of Indiana and Kentucky, Inc. Brigitte Amiri, Elizabeth Watson, AMERICAN CIVIL LIBERTIES UNION FOUNDATION, New York, New York, Donald L. Cox, LYNCH, COX, GILMAN & GOODMAN, P.S.C., Louisville, Kentucky, Heather L. Gatnarek, ACLU OF KENTUCKY, Louisville, Kentucky, Amy D. Cubbage, ACKERSON & YANN, PLLC, Louisville, Kentucky, for Appellees Women's Surgical Center, P.S.C. and Ernest Marshall, M.D. Thomas M. Fisher, OFFICE OF THE INDIANA ATTORNEY GENERAL, Indianapolis, Indiana, Heidi Parry Stern, OFFICE OF THE NEVADA ATTORNEY GENERAL, Carson City, Nevada, La Tasha Buckner, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort, Kentucky, Kimberly A. Parker, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C., for Amici Curiae.

LARSEN, J., delivered the opinion of the court in which READLER, J., joined. CLAY, J. (pp. 38–73), delivered a separate dissenting opinion.

_____

**OPINION**

_____

LARSEN, Circuit Judge. Two decades ago, the Kentucky General Assembly enacted a law requiring abortion facilities to obtain transfer agreements with a local hospital and transport agreements with a local ambulance service. Ky. Rev. Stat. (KRS) § 216B.0435. Regulations promulgated in 2017 imposed stricter conditions on the agreements but also allowed successive, ninety-day waivers for facilities unable to comply with the law. 902 Ky. Admin. Regs. (KAR) 20:360 § 10. The plaintiffs in this case, who were, at the time, Kentucky's only licensed abortion facility, its owner, and another facility seeking licensure, challenged the transfer- and transport-agreement requirements as imposing an undue burden on abortion access. The plaintiffs argued that it had become impossible for them to obtain the required agreements, and that the law's enforcement would leave Kentucky without a licensed abortion facility, thereby

eliminating abortion access in the Commonwealth. Agreeing with the plaintiffs, the district court held that Kentucky's requirements were facially invalid and permanently enjoined them.

Kentucky[1] appeals the permanent injunction, arguing, among other things, that the plaintiffs failed to show that the law would in fact leave the Commonwealth without a licensed facility, because a facility unable to obtain the required agreements could still obtain a waiver. Kentucky also appeals the district court's order imposing monetary sanctions for failure to produce a designee for a properly noticed deposition. We conclude that the district court did not abuse its discretion by imposing monetary sanctions, so we AFFIRM in part. But because the district court erred in concluding that Kentucky would be left without an abortion facility, we REVERSE in part, VACATE the permanent injunction, and REMAND for further proceedings.

I.

A.

In 1998, the Kentucky General Assembly imposed new licensing requirements on abortion providers in response to concerns about the appalling, unsanitary conditions in some Kentucky abortion facilities. As part of the new licensing scheme, the General Assembly enacted KRS § 216B.0435, which required abortion facilities to acquire "a written agreement with a licensed acute-care hospital capable of treating patients with unforeseen complications related to an abortion facility procedure" as well as "a written agreement with a licensed local ambulance service for the transport" of patients to the hospital. *Id.* § 216B.0435(1), (3). The statute also requires abortion facilities to file these agreements with Kentucky's Cabinet for Health and Family Services (CHFS or "the Cabinet"). *Id.* § 216B.0435(4). The Office of Inspector General oversees abortion facilities' compliance with these regulations. *Id.* § 194A.030(1)(c)(1)–(4). In addition to abortion facilities, Kentucky requires ambulatory surgical centers to "have a transfer agreement . . . in place with at least one (1) acute care hospital." Ky. Cabinet for Health & Fam. Servs., *2020–2022 State Health Plan* 52 (Aug. 2020); *see* 900 KAR 5:020 § 2(1) (incorporating by reference the state health plan).

---

[1]The defendants in this case are the Secretary of Kentucky's Cabinet for Health and Family Services and the Governor of Kentucky in their official capacities. We refer to the defendants collectively as "Kentucky" or "the Commonwealth."

Prior to 2017, Kentucky's regulations implementing the transfer- and transport-agreement requirements for abortion facilities merely parroted the statute. *See* 902 KAR 20:360 § 10 (2016). But beginning in 2016, Kentucky started scrutinizing these agreements more closely, requiring that they adhere to stricter standards. And during the early stages of this litigation in June 2017, Kentucky promulgated an emergency regulation amending 902 KAR 20:360 § 10 to address concerns raised by Kentucky's Inspector General regarding the lack of applicable compliance standards. The new regulation imposed more stringent conditions on the necessary agreements, including the requirement that transfer agreements be with a Kentucky-licensed acute care hospital in the same county as the abortion facility or within a twenty-minute drive. *See* 902 KAR 20:360 § 10(3)(a).

The new regulation also authorized ninety-day waivers of the transfer- and transport-agreement requirements. *Id.* § 10(5). To apply for a waiver, the facility must certify that it "has exhausted all reasonable efforts to obtain a transfer or transport agreement for a continuous ninety (90) calendar day period prior to the request." *Id.* § 10(5)(a)(2). In adjudicating the waiver request, the Inspector General must consider the facility's "[r]egulatory compliance history" along with whether the facility has made "a good faith effort to obtain a transfer or transport agreement" and whether the facility "can provide the same level of patient care and safety via alternative health services during any extension period." *Id.* § 10(5)(b)(1)–(3). Though initially promulgated as an emergency regulation, these requirements are now embedded in 902 KAR 20:360 § 10.

B.

For almost two decades, the transfer- and transport-agreement requirements posed no challenge for facilities seeking a license to perform abortions. According to the district court, compliance with KRS § 216B.0435 "appears to have been merely an item on the checklist of licensure requirements, and the submitted agreements did not receive serious scrutiny." But as noted above, Kentucky began to scrutinize the required agreements more closely in 2016.

1.

Back in 2009, Planned Parenthood of Indiana and Kentucky had begun taking steps to provide abortions in the Louisville area. Toward that end, Planned Parenthood raised nearly $4 million to build a new Louisville facility, which was completed in 2015. Planned Parenthood also obtained a transfer agreement with the Obstetrics and Gynecology Department at University of Louisville Hospital and a transport agreement with Louisville Metro Emergency Medical Services. It then filed an application with CHFS for an abortion-facility license in November 2015.

Health facilities in Kentucky may obtain a license only after the licensing agency performs an unannounced, on-site inspection to determine that the facility complies with all applicable regulations. 902 KAR 20:008 § 2(7). On December 1, 2015, an attorney for Planned Parenthood sent an email to then-Inspector General Maryellen Mynear communicating the organization's understanding that the on-site-inspection provision "requires the applicant to initiate business operations after filing an application so that your office will have an operational facility to review when the unannounced licensure survey is conducted." Inspector Mynear responded, agreeing that "a facility must be performing services for which it seeks licensure so that the survey (i.e., inspection) process may fully evaluate compliance with the applicable regulations." Planned Parenthood consequently began performing abortions in Louisville on December 3.

Matthew Bevin became Governor of Kentucky five days later on December 8, 2015, succeeding Steven Beshear. The following month, Stephanie Hold, the new acting Inspector General, sent a letter directing Planned Parenthood to stop performing abortions because its transfer and transport agreements were deficient and because Planned Parenthood was not yet licensed. The letter stated that the Cabinet could not continue its review of Planned Parenthood's license application until Planned Parenthood had submitted new, compliant agreements. It also rejected Inspector Mynear's interpretation of the licensing regulations, asserting that Planned Parenthood "is not permitted to perform the abortion procedure until a license is issued following an inspection of [its] facility." Planned Parenthood responded the next day, confirming that it was no longer performing abortions at its Louisville facility.

Adopting acting Inspector Hold's interpretation of the regulations, CHFS sued Planned Parenthood in state court in February 2016, alleging that the abortions Planned Parenthood had performed in December 2015 and January 2016 without a license had been illegal. The Cabinet's complaint requested that Planned Parenthood be fined for the alleged misconduct.

In the meantime, Planned Parenthood sought compliant transfer and transport agreements in order to complete its license application. It entered into new agreements with University of Louisville Hospital, but the hospital rescinded them shortly after signing them. Planned Parenthood then tried unsuccessfully to obtain an agreement with other Louisville hospitals. It ultimately entered into a transfer agreement with Clark Memorial Hospital in Indiana, which is five miles away from Louisville, as well as with University of Kentucky Hospital in Lexington. CHFS denied Planned Parenthood's license application in June 2016, finding the submitted transfer agreements inadequate. To support its decision, the Cabinet cited the distance between Planned Parenthood's Louisville facility and the University of Kentucky Hospital in Lexington and the fact that Clark Memorial Hospital was not a Kentucky-licensed hospital.

Later that month, the Jefferson Circuit Court dismissed the Cabinet's lawsuit against Planned Parenthood for failure to state a claim. *Commonwealth v. Planned Parenthood of Ind. & Ky.*, No. 16-CI-0802, slip op. at 4 (Jefferson Cir. Ct. June 30, 2016). The Kentucky Court of Appeals subsequently reversed the dismissal, holding that the Cabinet's "allegations are sufficient to state a claim upon which relief can be granted." *Commonwealth v. Planned Parenthood of Ind. & Ky., Inc.*, No. 2016-CA-001125-MR, 2017 WL 6398298, at *2 (Ky. Ct. App. Dec. 15, 2017). The suit remained ongoing throughout the proceedings below in this case.

2.

In addition to reviewing Planned Parenthood's new agreements, CHFS also took a hard look at the existing transfer and transport agreements of EMW Women's Surgical Center, P.S.C.—Kentucky's only licensed abortion facility at the time. Owned by Ernest Marshall, M.D., EMW's Louisville facility has performed abortions since the 1980s. Prior to 2020, the Louisville facility performed nearly all abortions in the Commonwealth. Dr. Marshall and all other physicians on staff at EMW maintain admitting privileges at local hospitals. And prior to

2017, EMW maintained a transfer agreement with University of Louisville Hospital and a transport agreement with Mercy Ambulance Service.

EMW had renewed its abortion facility license without issue in early 2016. The new license was valid through May 31, 2017. But in March 2017, CHFS notified EMW that its license had been renewed in error. EMW's transfer and transport agreements, the Cabinet explained, were not in compliance with Kentucky law. EMW was given ten days to cure the deficiencies. If it failed to do so, it would have to either file an administrative appeal or lose its license. EMW sought to cure the deficiencies, but no Louisville hospital would enter into a compliant transfer agreement.

C.

Unable to secure a transfer agreement that would satisfy the Cabinet's seemingly new and more rigorous interpretation of the transfer-agreement regulation, EMW and Dr. Marshall sued Vickie Yates Brown Glisson, then the Secretary of CHFS, in her official capacity in the United States District Court for the Western District of Kentucky. They alleged that (1) the enforcement of the transfer- and transport-agreement requirements violated substantive due process by "impos[ing] a substantial obstacle on women seeking abortions," (2) revoking EMW's license would violate procedural due process, (3) Kentucky had unconstitutionally "delegate[d] standardless and unreviewable authority to private parties," and (4) Kentucky's arbitrary enforcement of the requirements constituted First Amendment retaliation. EMW and Dr. Marshall asked the district court to declare Kentucky's requirements unconstitutional and to enjoin CHFS from enforcing those requirements.

Two days after the plaintiffs filed suit, the district court granted an *ex parte* motion for a temporary restraining order prohibiting Kentucky from enforcing KRS § 216B.0435 and 902 KAR 20:360 for fourteen days. The parties then agreed that the terms of the temporary restraining order "will continue in full force and effect as a Preliminary Injunction until a final judgment is entered in this action."

In June 2017, Planned Parenthood intervened in the lawsuit. Besides suing the Secretary of CHFS, Planned Parenthood also named then-Governor Bevin as a defendant in his official

capacity. Planned Parenthood alleged that (1) Kentucky's transfer- and transport-agreement requirements had the purpose and effect of imposing an undue burden on women seeking an abortion, (2) the requirements violated the Equal Protection Clause by discriminating against abortion facilities, (3) CHFS's denial of Planned Parenthood's license application violated procedural due process, (4) Kentucky's requirements constituted an unconstitutional delegation of authority to private parties, (5) Kentucky's failure to credit Planned Parenthood's agreement with an Indiana hospital violated the Full Faith and Credit Clause, and (6) Kentucky's requirements were void for vagueness. Like EMW, Planned Parenthood asked the district court to declare Kentucky's requirements unconstitutional and to enjoin their further enforcement.

After a three-day bench trial, the district court found "that the scant medical benefits from transfer and transport agreements are far outweighed by the burden" they "impose[] on Kentucky women seeking abortions." *EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17-CV-00189-GNS, 2018 WL 6444391, at *1 (W.D. Ky. Sept. 28, 2018). The court therefore concluded "that the challenged laws impermissibly 'place[] a substantial obstacle in the path of women seeking a previability abortion [and] constitute[] an undue burden on abortion access.'" *Id.* (alterations in original) (quoting *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016)). On this basis, the district court held that both the statute and the new regulations (which had yet to be enforced) were unconstitutional. *Id.* at *30. The court issued a permanent injunction against their enforcement. *Id.*

After granting judgment for the plaintiffs on their substantive due process claims, the district court dismissed with prejudice EMW and Dr. Marshall's procedural due process and First Amendment retaliation claims along with Planned Parenthood's procedural due process, full faith and credit, and vagueness claims. *Id.* The district court dismissed the plaintiffs' other claims as moot.[2] *Id.* Kentucky timely filed a notice of appeal.

---

[2]Based on what appears to be a clerical error in the district court's opinion, Kentucky claims that the court erroneously granted judgment on Planned Parenthood's equal protection claim without making any relevant factual findings or legal conclusions. *See* 2018 WL 6444391, at *30 (granting judgment in favor of Planned Parenthood on Counts I *and* II of its complaint). But the district court expressly declined to adjudicate the equal protection claim. *See id.* at *28 n.29. And the court's judgment confirms that it granted judgment only on the plaintiffs' substantive due process challenge.

In addition to the parties, several *amici* submitted briefs on appeal. Most notably, Andrew Beshear, then the Attorney General of Kentucky, filed a brief in support of the plaintiffs, arguing that the district court should be affirmed because 902 KAR 20:360 § 10 is unconstitutional.

D.

After Kentucky filed its notice of appeal, Planned Parenthood again applied for an abortion-facility license in July 2019. CHFS denied the application in August 2019 on the ground that Planned Parenthood had illegally performed abortions without a license in December 2015 and January 2016. Kentucky filed notice of this denial with the district court.

In December 2019, Attorney General Andrew Beshear became the new Governor of Kentucky, replacing Matthew Bevin. That same month, Governor Beshear appointed Eric Friedlander as Secretary of CHFS. Shortly thereafter, the Cabinet reversed its position on the legality of Planned Parenthood's December 2015 and January 2016 abortions. In January 2020, the Cabinet voluntarily dismissed its lawsuit against Planned Parenthood because it had "determined that there was not a 'substantial failure to comply' with the provisions of KRS § 216B by the Defendant when applying for a license to begin operation of its Louisville facility." Stipulation of Dismissal, *Commonwealth v. Planned Parenthood of Ind. & Ky., Inc.*, No. 16-CI-0802 (Jefferson Cir. Ct. filed Jan. 14, 2020).[3] That same month, and for the same reason, the Cabinet rescinded its denial of Planned Parenthood's license application and invited the organization to reapply. Planned Parenthood did so and received a provisional license for its Louisville facility by January 31, 2020. The facility presently performs abortions.[4]

---

[3]The parties have not fully informed this court of the developments that have occurred since Governor Beshear's election. We may, however, "take judicial notice of developments in related 'proceedings in other courts of record.'" *Chase Bank USA, N.A. v. City of Cleveland*, 695 F.3d 548, 553 n.2 (6th Cir. 2012) (quoting *Walburn v. Lockheed Martin Corp.*, 431 F.3d 966, 972 n.5 (6th Cir. 2005)).

[4]*See* Additional Citation of Att'y Gen. Cameron, ECF No. 96, at 2 ("Planned Parenthood has been granted a license to operate an abortion facility in Louisville."); Appellees' Opp'n to Mot. to Intervene, ECF No. 90, at 11 (acknowledging that "Planned Parenthood was . . . able to obtain a license"); *Planned Parenthood to Expand Abortion Access in Kentucky*, Planned Parenthood (Jan. 31, 2020, 10:25 PM), https://www.plannedparenthood.org/planned-parenthood-indiana-kentucky/newsroom/planned-parenthood-to-expand-abortion-access-in-kentucky [https://perma.cc/W4QU-7DRK]; *Louisville Health Center of Louisville, KY*, Planned Parenthood, https://www.plannedparenthood.org/health-center/kentucky/louisville/40203/louisville-health-

On June 29, 2020, the Supreme Court decided *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020), striking down a Louisiana law requiring abortion doctors to have admitting privileges at a local hospital. Eight days later, the plaintiffs in this case submitted a letter to the clerk of this court citing *June Medical Services* as a supplemental authority in favor of affirmance. *See* Fed. R. App. P. 28(j). Kentucky did not respond to the letter. Then, on July 24, Daniel Cameron, who replaced now-Governor Beshear as Attorney General of Kentucky, filed a motion in this court to intervene in his official capacity as a defendant-appellant so that he could submit a Rule 28(j) letter on behalf of the Commonwealth responding to the plaintiffs' letter. We granted the motion on August 6, and Attorney General Cameron submitted a letter on August 12.

## II.

Kentucky challenges the district court's ruling that KRS § 216B.0435 and 902 KAR 20:360 § 10 violate Kentucky women's substantive due process right to abortion and its permanent injunction of their enforcement. The Commonwealth claims as a threshold matter that EMW and Planned Parenthood, as abortion providers, do not have standing to challenge health regulations on the ground that they violate their patients' right to abortion. It further argues that the challenged provisions are constitutional because they serve a legitimate purpose and do not impose a substantial obstacle to abortion access. Kentucky's standing argument is now foreclosed by Supreme Court precedent. *See June Med. Servs.*, 140 S. Ct. at 2118–20 (plurality opinion); *id.* at 2139 n.4 (Roberts, C.J., concurring in the judgment). We therefore proceed to the merits.

---

center-3290-90500 [https://perma.cc/EKP2-V256] (last visited Sept. 18, 2020) (listing "Abortion" under "Services Offered"). We "may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *United States v. Ferguson*, 681 F.3d 826, 834 (6th Cir. 2012) (alteration in original) (quoting Fed. R. Evid. 201(b)); *see Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2375 (2020) (taking judicial notice of information from a nongovernmental organization's website); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 655 n.1 (6th Cir. 2005) (same).

A.

1.

"In determining whether a district court has properly granted a permanent injunction, we review factual findings for clear error, legal conclusions de novo, and the scope of injunctive relief for abuse of discretion." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir. 2011) (quoting *Gibson Guitar Corp. v. Paul Reed Smith Guitars, LP*, 423 F.3d 539, 546 (6th Cir. 2005)). A finding of fact is clearly erroneous when, after reviewing the full record, "we are 'left with the definite and firm conviction that a mistake has been committed.'" *June Med. Servs.*, 140 S. Ct. at 2141 (Roberts, C.J., concurring in the judgment) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)); *accord United States v. Ramamoorthy*, 949 F.3d 955, 964 (6th Cir. 2020). Although this standard "is deferential, it is not nugatory," and we "may reverse a lower [court's] factual finding for clear error . . . even though the record contains some evidence in support of the finding." *Indmar Prods. Co. v. Comm'r*, 444 F.3d 771, 778 (6th Cir. 2006) (quoting *Holmes v. Comm'r*, 184 F.3d 536, 543 (6th Cir. 1999)). Moreover, the clear-error rule "does not inhibit an appellate court's power to correct errors of law, including those that may infect . . . a finding of fact that is predicated on a misunderstanding of the governing rule of law." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 501 (1984); *accord Abbott v. Perez*, 138 S. Ct. 2305, 2326 (2018).

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008); *see Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (applying this standard in the abortion context). To obtain a permanent injunction, the plaintiffs must "establish that" their patients have "suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law." *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2006) (quoting *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998)). It is not enough for plaintiffs to show a "possibility" of a constitutional violation or even a "likelihood" of one; to obtain permanent injunctive relief, the plaintiffs must make a clear showing that the challenged provisions "actual[ly]" violate their patients' constitutional rights. *See Winter*, 555 U.S. at 21, 32 (quoting *Amoco Prod. Co. v. Village of*

*Gambell*, 480 U.S. 531, 546 n.12 (1987)).   If they succeed in demonstrating an actual constitutional violation and continuing irreparable injury, the plaintiffs must also show "that the public interest would not be disserved by a permanent injunction."  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

2.

The constitutionality of laws regulating abortion is governed by the "undue burden" test set forth in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 869–79 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.).  *See Stenberg v. Carhart*, 530 U.S. 914, 921 (2000).   Under that standard, a law regulating abortion is invalid if it "imposes an undue burden on a woman's ability" to choose to have an abortion before viability.  *Casey*, 505 U.S. at 874 (joint opinion).  "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."  *Id.* at 877.  Conversely, a law which "serves a valid purpose" without imposing a substantial obstacle is constitutional, even if it "has the incidental effect of making it more difficult or more expensive to procure an abortion."  *Id.* at 874.

Twenty-four years after *Casey*, the Supreme Court stated in *Whole Woman's Health v. Hellerstedt* that the undue burden test "requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. at 2309; *see also id.* at 2310 (stating that district court properly "weighed the asserted benefits" of the regulations at issue "against the burdens").  Relying on this language, the district court in the present case framed its inquiry not as whether KRS § 216B.0435 and 902 KAR 20:360 § 10 served a valid purpose yet imposed a substantial obstacle; instead it asked whether the benefits of the challenged provisions outweighed their burdens.

While this case was pending on appeal, the Supreme Court again considered the meaning of the undue burden test in *June Medical Services L.L.C. v. Russo*, 140 S. Ct. 2103 (2020). There, a fractured majority of the Court invalidated a Louisiana statute requiring abortion doctors to have admitting privileges at a hospital within thirty miles of where they perform abortions.  *Id.*

at 2112, 2133 (plurality opinion); *id.* at 2142 (Roberts, C.J., concurring in the judgment). The plurality opinion, joined by four Justices, took a balancing approach, determining that the undue burden "standard requires courts independently to review the legislative findings upon which an abortion-related statute rests and to weigh the law's 'asserted benefits against the burdens' it imposes on abortion access." *Id.* at 2112 (plurality opinion) (quoting *Whole Woman's Health*, 136 S. Ct. at 2310). The district court in that case had found that the Louisiana law would not advance the state's interest in women's health and that many women seeking an abortion in Louisiana would be unable to obtain one if the law went into effect. *Id.* Because the district court's findings were not clearly erroneous, the plurality upheld the district court's determination "that the balance tipped against the statute's constitutionality." *Id.* at 2120.

Writing for himself, Chief Justice Roberts agreed with the plurality that the district court's findings as to the law's burdens were not clearly erroneous. *Id.* at 2139–41 (Roberts, C.J., concurring in the judgment). "Because Louisiana's admitting privileges requirement would restrict women's access to abortion to the same degree as Texas's law" invalidated in *Whole Woman's Health*, the Chief Justice concluded that the Louisiana law could not "stand under [the Court's] precedent." *Id.* at 2139. At the same time, however, he parted ways with the plurality on what that precedent meant. According to the Chief Justice, "[n]othing about *Casey* suggested that a weighing of costs and benefits of an abortion regulation was a job for the courts." *Id.* at 2136. Instead, "the 'traditional rule' that 'state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty' is 'consistent with *Casey*.'" *Id.* (alteration in original) (quoting *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007)). And, because the Court in *Whole Woman's Health* said "that it was applying the undue burden standard of *Casey*" and "[n]othing more," Chief Justice Roberts explained that he read *Whole Woman's Health*, like *Casey*, as "requiring a substantial obstacle before striking down an abortion regulation." *Id.* at 2138–39. Meanwhile, he read "the discussion of benefits in *Whole Woman's Health* []as not necessary to its holding." *Id.* at 2139 n.3. In other words, the Chief Justice explained, "*Whole Woman's Health* held that Texas's admitting privileges requirement placed 'a substantial obstacle in the path of women seeking a previability abortion,' independent of its discussion of benefits." *Id.* at 2139 (quoting *Whole Woman's Health*, 136 S. Ct. at 2300).

According to the Chief Justice, an abortion-related law's asserted "benefits" are relevant only "in considering the threshold requirement that the State have a 'legitimate purpose' and that the law be 'reasonably related to that goal.'" *Id.* at 2138 (quoting *Casey*, 505 U.S. at 878, 882 (joint opinion)). "So long as that showing is made, the only question for a court is whether a law has the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *Id.* (quoting *Casey*, 505 U.S. at 877 (joint opinion)).

3.

Because no opinion in *June Medical Services* garnered a majority, we, as a lower court, have the "vexing task" of deciding which opinion controls. *Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 133 (6th Cir. 1994). In this situation, the Supreme Court has instructed us to treat the "position taken by [the Justice or Justices] who concurred in the judgment[] on the narrowest grounds" as "the holding of the Court." *Marks v. United States*, 430 U.S. 188, 193 (1977) (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). We therefore "must follow the reasoning of the concurring opinion with the narrowest line of reasoning" that is "capable of supporting the Court's judgment in that case." *Grutter v. Bollinger*, 288 F.3d 732, 741 n.6 (6th Cir. 2002) (en banc), *aff'd*, 539 U.S. 306 (2003). "[T]he rationales supporting the Court's judgment need not overlap on essential points in order to provide a holding that binds lower courts. Indeed, if the Justices agreed on essential points, the *Marks* analysis would be unnecessary." *Id.* at 740. Instead, we are to look to the "results" that the rationales of the concurring opinions "will . . . produce" when applied in future cases. *United States v. Kratt*, 579 F.3d 558, 562–63 (6th Cir. 2009) (quoting *Triplett Grille*, 40 F.3d at 134); *see Grutter*, 288 F.3d at 741.

In a fractured decision where two opinions concur in the judgment, an opinion will be the narrowest under *Marks* if the instances in which it would reach the same result in future cases form "a logical subset" of the instances in which the other opinion would reach the same result. *Kratt*, 579 F.3d at 562 (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). This is so because in that subset of cases, a majority of the Court which issued the fractured decision would necessarily agree with the result. *See Triplett Grille*, 40 F.3d at 134. In a fractured decision upholding the constitutionality of a law, that means the narrowest opinion is

the one whose rationale would uphold the fewest laws going forward.[5]  For example, in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978), which upheld a state medical school's policy of considering race in admissions, Justice Brennan's four-Justice opinion concluded that "the more permissive intermediate scrutiny standard would apply" to the consideration of race in admissions, whereas Justice Powell concluded that "strict scrutiny would apply." *Grutter*, 288 F.3d at 741.  We held that "[b]ecause the set of constitutionally permissible racial classifications under intermediate scrutiny by definition includes those classifications constitutionally permissible under strict scrutiny, Justice Powell's rationale would permit the most limited consideration of race; therefore, it is *Bakke*'s narrowest rationale." *Id.*

Conversely, when a fractured decision strikes down a law as unconstitutional, the narrowest opinion is the one whose rationale would invalidate the fewest laws going forward. *Memoirs v. Massachusetts*, 383 U.S. 413 (1966), for instance, "revers[ed] the Massachusetts Supreme Court's holding that a book depicting a prostitute's life was suppressible obscenity." *Grutter*, 288 F.3d at 739.  "Justices Brennan and Fortas and the Chief Justice found the book was not suppressible obscenity because it was not 'utterly without redeeming social value,'" whereas "Justices Black and Douglas did not reach the issue of whether the book was suppressible obscenity because they believed the First Amendment provides an absolute shield against government regulation of expression." *Id.* (citations omitted).  Anytime Justice Brennan's opinion would conclude that a writing was not suppressible obscenity, Justices Black and Douglas would agree, but the reverse is not true.  The Supreme Court thus held in *Marks* that Justice Brennan's opinion controlled because it "provided the most limited First Amendment protection." *Id.* at 739–40; *see Marks*, 430 U.S. at 194.[6]

---

[5]Citing *United States v. Cundiff*, the dissent argues that we have read *Marks* to say that the "narrowest opinion . . . is the concurring opinion that offers the least change to the law."  555 F.3d 200, 209 (6th Cir. 2009) (citations and quotation marks omitted).  But the court's discussion of *Marks* in *Cundiff* is entirely dictum, as evidenced by its own language.  The court decided to "leave ultimate resolution of the [*Marks*] debate to a future case that turns on which test in-fact controls." *Id.* at 210.

[6]Justice Stewart also concurred in *Memoirs*, concluding that the book at issue "was not suppressible obscenity because it was not hardcore pornography." *Grutter*, 288 F.3d at 739 (citation omitted).  Although his opinion "was also a logical subset of Justice Black and Douglas' opinion," it "would only have spoken for three Justices and could therefore not have been the controlling rationale." *King*, 950 F.2d at 781 n.6.

Turning now to *June Medical Services*, because the Court invalidated the Louisiana statute at issue, the narrowest opinion concurring in the judgment is the one that would strike down the fewest laws regulating abortion in future cases. The Chief Justice read the rule laid down in the Court's precedents to say that laws not "reasonably related" to a "legitimate purpose" or that impose a "substantial obstacle" are unconstitutional. *June Med. Servs.*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878, 882 (joint opinion)). All other laws regulating abortion, however, "are valid." *Id.* at 2138 n.2. Like the Chief Justice, the plurality would invalidate any law with "the effect of placing a substantial obstacle in the path of a woman's choice" to obtain a previability abortion. *Id.* at 2120 (plurality opinion) (quoting *Whole Woman's Health*, 136 S. Ct. at 2309). But the plurality would also invalidate any law where "the balance" between the law's benefits and its burdens "tipped against the statute's constitutionality." *Id.* Presumably, this would include some laws that are reasonably related to a legitimate purpose and that do not impose a substantial obstacle, so long as the law's burdens sufficiently outweighed its benefits.**[7]**

Because all laws invalid under the Chief Justice's rationale are invalid under the plurality's, but not all laws invalid under the plurality's rationale are invalid under the Chief Justice's, the Chief Justice's position is the narrowest under *Marks*. His concurrence therefore "constitutes [*June Medical Services*'] holding and provides the governing standard here." *Grutter*, 288 F.3d at 741; *see also Hopkins v. Jegley*, 968 F.3d 912, 916 (8th Cir. 2020) (per

---

**[7]**The plurality expressly reserved the question of what "standard of review" to "apply in cases where a regulation is found *not* to impose a substantial obstacle to a woman's choice." *June Med. Servs.*, 140 S. Ct. at 2133 (plurality opinion). Even with this reservation, however, the plurality's approach to reviewing the benefits of abortion regulations is still more stringent (or is at least not less stringent) than the Chief Justice's. An abortion regulation is reasonably related to a legitimate state interest under the Chief Justice's rationale if it has a rational basis. *See id.* at 2135. The plurality, on the other hand, would require states to introduce evidence affirmatively establishing the benefits their laws confer. *See id.* at 2132 (concluding the challenged statute had no substantial health benefit because "the State introduced no evidence" to that effect). That approach is more stringent than traditional rational-basis review, under which "the government 'has no obligation to produce evidence to sustain the rationality of its action.'" *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 694 (6th Cir. 2014) (quoting *TriHealth, Inc. v. Bd. of Comm'rs*, 430 F.3d 783, 790 (6th Cir. 2005)). In any event, even if the precise level of scrutiny it would apply is unclear, the plurality would clearly scrutinize the benefits of abortion-related laws to some extent. *See June Med. Servs.*, 140 S. Ct. at 2120 (plurality opinion) ("[C]ourts must 'consider the burdens a law imposes on abortion access together with the benefits those laws confer.'" (citation omitted)). And rational-basis review is "the least demanding" tier of scrutiny "used by the courts." *Berger v. City of Mayfield Heights*, 154 F.3d 621, 625 (6th Cir. 1998). It is therefore logically impossible for the plurality opinion's standard to be more generous than the Chief Justice's.

curiam) (holding that "Chief Justice Roberts's separate opinion in *June Medical . . .* is controlling").[8]  "While 'there is some awkwardness in attributing precedential value to an opinion of one Supreme Court justice to which no other justice adhered, it is the usual practice when that is the determinative opinion.'" *Triplett Grille*, 40 F.3d at 134 (quoting *Blum v. Witco Chem. Corp.*, 888 F.2d 975, 981 (3d Cir. 1989)); *accord Grutter*, 288 F.3d at 741–42.[9]

Under the Chief Justice's controlling opinion, a law regulating abortion is valid if it satisfies two requirements.  First, it must be "'reasonably related' to a legitimate state interest." *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878 (joint opinion)).  Because we are to apply "the 'traditional rule'" of deference to the state's "medical and scientific" judgments, *id.* at 2136 (quoting *Gonzales*, 550 U.S. at 163), this requirement is met whenever a state has "a rational basis to . . . use its regulatory power," *Gonzales*, 550 U.S. at 158.  Second, the law must not "ha[ve] the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'"  *June Med. Servs.*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 877 (joint opinion)).  Under the law of our circuit, a woman faces a substantial obstacle when she is "deterred from procuring an abortion as surely as if the [government] has outlawed abortion in

---

[8]Although we join the Eighth Circuit in this conclusion, a divided panel of the Fifth Circuit disagrees, concluding "that the challenged Louisiana law posed an undue burden on women seeking an abortion is the full extent of *June Medical*'s ratio decidendi." *Whole Woman's Health v. Paxton*, 972 F.3d 649, 653 (5th Cir. 2020) (per curiam).  *But see id.* at 654 (Willett, J., dissenting) (concluding that the Chief Justice's opinion states "the now-governing legal standard").  The Fifth Circuit concluded that the Chief Justice's opinion cannot "be viewed as a logical subset of the" plurality because "the Chief Justice expressly disavowed the plurality's test." *Id.* at 652–53 (majority opinion).  "But fundamental disagreements about how to interpret [the provision of law at issue] do not necessarily destroy a subset-superset relationship between the two opinions." *Kratt*, 579 F.3d at 562; *accord Grutter*, 288 F.3d at 740.  The Chief Justice's opinion is a logical subset of the plurality's not because it agrees with all of the plurality's reasoning but because in every case in which it would invalidate an abortion regulation, the plurality would also invalidate that regulation.  If that were not so, *Marks* itself would be wrongly decided.  The *Memoirs* plurality disavowed Justices Douglas and Black's view that the First Amendment absolutely prohibited suppressing obscenity.  Thus, under the logic of *Paxton*, the *Memoirs* plurality would not control because "the only common denominator between the plurality and the concurrence is their shared conclusion that the challenged [conviction] constituted [a First Amendment violation]." *Paxton*, 972 F.3d at 652.

[9]We are buoyed in this position by Supreme Court orders vacating two Seventh Circuit decisions and remanding for further consideration in light of *June Medical Services*. *See Box v. Planned Parenthood of Ind. & Ky.*, No. 19-816, 2020 WL 3578672, at *1 (U.S. July 2, 2020); *Box v. Planned Parenthood of Ind. & Ky.*, No. 18-1019, 2020 WL 3578669, at *1 (U.S. July 2, 2020).  The vacated circuit decisions used a balancing approach to invalidate the laws at issue.  If the Court believed that the balancing approach was the appropriate test, it is unclear why it issued these orders.

all cases." *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 370 (6th Cir. 2006) (alteration in original) (quoting *Casey*, 505 U.S. at 894). Even if a law regulating abortion is unconstitutional in some applications, the law remains facially valid so long as it does not impose an undue burden "in a large fraction of the cases in which [the regulation] is relevant." *Casey*, 505 U.S. at 895; *accord Cincinnati Women's Servs.*, 468 F.3d at 369.

4.

The dissent faults us for treating "the entirety of Chief Justice Roberts' concurring opinion" as authoritative and argues that we should instead look only to the reasoning that was "necessary to his vote to concur." Dissenting Op. at 46–47. If this were the *Marks* rule, applying *Marks* would be pointless. The way we distinguish the "narrower" concurring opinion in a fractured decision from the "broader" one is by identifying differences in their reasoning. But because the narrower and broader opinions both concur in the judgment, the narrower opinion's points of disagreement with the broader one—i.e. the very feature of the opinion that makes it "narrower"—are by definition not necessary to its ultimate conclusion that the judgment is correct. Thus, in any case where it matters which opinion has the narrower view, the dissent's approach would have us set aside the narrower opinion's points of disagreement as dictum, and the application of *Marks* would fail to provide a governing rule of law. Yet "[t]he principal objective of this *Marks* rule . . . requires that, whenever possible, there be a single legal standard for the lower courts to apply in similar cases." *Triplett Grille*, 40 F.3d at 133 (citation omitted). It comes as no surprise, then, that binding precedent forecloses the dissent's approach.

Start with *Marks* itself. The majority in *Memoirs*, the decision analyzed in *Marks*, split on the states' power to treat written works with no redeeming social value as suppressible obscenity. The plurality took a more permissive approach, concluding that states may suppress a book if "(a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value." *Memoirs*, 383 U.S. at 418 (plurality opinion). Justices Black and Douglas adopted a stricter approach, concluding that "the First Amendment provides an absolute shield against governmental action aimed at suppressing obscenity." *Marks*, 430 U.S. at

193.  But because the book at issue did have redeeming social value, *see Memoirs*, 383 U.S. at 419 (plurality opinion), the plurality agreed with Justices Black and Douglas that the work was not constitutionally suppressible, and the plurality's view on the status of works with no redeeming social value was not necessary to their votes to concur.

Under the dissent's logic, the "narrowest reasoning supporting the judgment" in *Memoirs* would be "simply and only" that a book with some redeeming social value is not suppressible obscenity.  Though the three-Justice plurality rejected the view that the First Amendment is an absolute shield against obscenity laws, that conclusion would be treated as "dicta, as it was not necessary to [their] vote[s] to concur."  *See id.*  Accordingly, under the dissent's reasoning, the *Memoirs* plurality's discussion of the constitutional status of books with no redeeming social value would not control, just as, the dissent believes, the Chief Justice's discussion of abortion regulations not imposing a substantial obstacle is not controlling.

The Supreme Court, however, rejected that view in *Marks*.  According to the Court, "[t]he view of the *Memoirs* plurality . . . constituted the holding of the Court *and* provided the governing standards" for what constituted suppressible obscenity, meaning that states could suppress obscene materials if "the prosecution carried the burden of proving that they were 'utterly without redeeming social value,' and otherwise satisfied the stringent *Memoirs* requirements."  *Marks*, 430 U.S. at 194 (emphasis added); *see also id.* at 194 n.8 (citing with approval *United States v. Groner*, 479 F.2d 577, 588–89 (5th Cir. 1973) (en banc) (Clark, J., concurring), and *Huffman v. United States*, 470 F.2d 386, 394 (D.C. Cir. 1971), which affirmed obscenity convictions because the government had established all three requirements set out in the *Memoirs* plurality).  *Marks* itself therefore establishes that the entirety of the test articulated in the narrowest opinion concurring in the judgment—and not merely those conclusions strictly necessary to its view that the judgment is correct—is "the controlling opinion" in that case. 430 U.S. at 193.

The dissent's approach also contravenes our own caselaw.  In *Grutter*, we held that "this court must follow the reasoning of the concurring *opinion* [in *Bakke*] with the narrowest line of reasoning on the issue of why the California Supreme Court could not permanently enjoin [the University of California at] Davis from considering race."  288 F.3d at 741 n.6 (emphasis

added).   Accordingly, we concluded that "this court is bound by Justice Powell's *Bakke* opinion."   *Id.* at 742; *see also id.* at 758 (Clay, J., concurring) ("Justice Powell's opinion in *Bakke* is controlling.").   Although the only admissions program before the Court in *Bakke* was U.C. Davis's, Justice Powell, writing only for himself, discussed at length Harvard College's consideration of race in admissions and concluded that it survived strict scrutiny under the Equal Protection Clause.   *Bakke*, 438 U.S. at 316–18 (opinion of Powell, J.).

This was, of course, pure dictum.   But because it was "our view that whether the [Michigan] Law School's admissions policy passes constitutional muster turns on Justice Powell's opinion," we held that "an admissions policy modeled on the Harvard plan, where race and ethnicity are considered a 'plus,' does not offend the Equal Protection Clause."   *Grutter*, 288 F.3d at 745–46.   Because we thought the University of Michigan Law School's use of race in admissions was "virtually indistinguishable from the Harvard plan Justice Powell approved in *Bakke*," we upheld it as constitutional.   *Id.* at 747; *see also id.* at 758 (Clay, J., concurring) ("I concur in Chief Judge Martin's majority opinion, finding it correct and insightful in all respects.").   The lead dissent in *Grutter* contended that it was inappropriate to rely on Justice Powell's endorsement of the Harvard plan because that discussion was "non-binding dicta."   *Id.* at 786 (Boggs, J., dissenting).   The majority squarely rejected that argument, holding that the endorsement of the Harvard plan provided the "appropriate basis for our opinion," "[e]ven if this portion of Justice Powell's opinion could be labeled dicta."   *Id.* at 746 n.9 (majority opinion).

In short, the narrowest concurring opinion does not merely state the Court's holding; it "is the Court's opinion" in that case, entitled to as much authority and respect as any other opinion of the Supreme Court.   *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 386 n.2 (6th Cir. 2008); *see United States v. Duvall*, 740 F.3d 604, 611 (D.C. Cir. 2013) (Kavanaugh, J., concurring in the denial of rehearing en banc) ("The binding opinion from a splintered decision is as authoritative for lower courts as a nine-Justice opinion. . . . This is true even if only one Justice issues the binding opinion." (citation omitted)).   We therefore adhere to both the holding of the narrowest concurring opinion and its well-considered dictum setting forth a general standard for how to apply the doctrine at issue.   *See ACLU of Ky. v. McCreary County*, 607 F.3d 439, 447–48 (6th Cir. 2010) (Clay, J.) ("[T]his court considers itself bound by Supreme Court

dicta almost as firmly as by the Court's outright holdings, particularly when the dicta is recent and not enfeebled by later statements." (citation omitted)). Because the Chief Justice's controlling opinion in *June Medical Services* sets forth, in a considered opinion, a general standard for how to apply the undue burden test, we must treat that standard as authoritative.

The dissent also invokes *Agostini v. Felton*, which says that a lower court may not hold that "more recent cases" of the Supreme Court "have, by implication, overruled an earlier precedent." 521 U.S. 203, 237 (1997). Instead, "[i]f a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions," we "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Id.* (first alteration in original) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)). But as the dissent rightly acknowledges, "Chief Justice Roberts emphasized from the start that he was *not* considering the validity of *Whole Woman's Health*." Dissenting Op. at 47. By its own terms, the Chief Justice's opinion interpreted and applied *Whole Woman's Health* and did not overrule it. As a lower court, we are bound by the Chief Justice's interpretation of *Whole Woman's Health*, regardless of whether we would adopt that interpretation as a matter of first impression.

To see this, we need look no further than *Casey* itself. In that case, only three Justices embraced the undue burden standard. *See Casey*, 505 U.S. at 874–79 (joint opinion). Although those three Justices concluded that "the essential holding of *Roe* [*v. Wade*, 410 U.S. 113 (1973),] should be reaffirmed," *Casey*, 505 U.S. at 871 (joint opinion), they nevertheless "reject[ed] the trimester framework" established by *Roe* as not "part of the [decision's] essential holding." *Id.* at 873. A lower court applying *Roe* as a matter of first impression would certainly not have felt free to reject the trimester framework, *see, e.g.*, *Wolfe v. Schroering*, 541 F.2d 523, 525 (6th Cir. 1976) (applying the trimester framework in the aftermath of *Roe*), and the other six Justices in *Casey* rejected the joint opinion's reading of *Roe*, *see Casey*, 505 U.S. at 914 (Stevens, J., concurring in part and dissenting in part); *id.* at 930 (Blackmun, J., concurring in part, concurring in the judgment in part, and dissenting in part); *id.* at 954 (Rehnquist, C.J., concurring in the judgment in part and dissenting in part).

But it does not matter whether any lower court judge might believe, to paraphrase the dissent, that the three Justices' "conclusion [about *Roe*] is contradicted by the clear language of that case, as well as by [their] fellow justices in [*Casey*]." *See* Dissenting Op. at 47 n.4 (citation omitted). Because the *Casey* joint opinion controls under *Marks*, we are bound by its interpretation of *Roe*. *See Women's Med. Pro. Corp. v. Voinovich*, 130 F.3d 187, 192 (6th Cir. 1997) (holding that "a plurality of the *Casey* Court discarded the trimester framework of *Roe*"). Likewise, because the Chief Justice's opinion in *June Medical Services* controls under *Marks*, we are bound by its interpretation of *Whole Woman's Health*. And if *Casey*'s joint opinion did not implicitly overrule *Roe*, neither did the Chief Justice's opinion implicitly overrule *Whole Woman's Health*.

For similar reasons, we are not swayed by the dissent's appeal to the plurality opinion in *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). *Ramos* is inapposite because, again, we do not rely on "a single Justice's opinion" that purports to "overrule prior precedents." *Id.* at 1403 (plurality opinion). And, in any event, the three-Justice plurality in *Ramos* is itself not controlling under *Marks*.[10] The *Ramos* plurality's statement therefore does not govern.

The Chief Justice's opinion in *June Medical Services* concurs in the judgment on the narrowest grounds, so it is the "controlling opinion" from that decision. *Marks*, 430 U.S. at 193. We must apply its reasoning as we would the reasoning of any other controlling Supreme Court opinion. *Duvall*, 740 F.3d at 611 (Kavanaugh, J., concurring in the denial of rehearing en banc).

---

[10]Six Justices in *Ramos* agreed that *Apodaca v. Oregon*, 406 U.S. 404 (1972), a split decision with no readily identifiable "narrowest" opinion, should be overruled. With the exception of Justice Thomas, the Justices concurring in the judgment disagreed solely on whether *Apodaca* carried precedential force. In such a case where the Court overrules a decision, the narrowest opinion will be the one that will overrule the fewest future decisions. Because the plurality lends no *stare decisis* weight to fractured decisions with no single controlling opinion, it would overrule all such decisions that reached an incorrect result. *See Ramos*, 140 S. Ct. at 1402 (plurality opinion). Justices Sotomayor and Kavanaugh, on the other hand, would overrule all such decisions that reached an incorrect result *if* the *stare decisis* factors militated in favor of overruling. *See id.* at 1409 (Sotomayor, J., concurring as to all but Part IV-A); *id.* at 1414 (Kavanaugh, J., concurring in part). Thus, whenever Justices Sotomayor and Kavanaugh would agree that a case with no controlling rationale should be overturned, a majority of the Court would concur in the result, because the three Justices in the plurality would necessarily agree. When the *stare decisis* factors would not favor overruling a decision with no controlling opinion, on the other hand, at most only four Justices (the plurality plus Justice Thomas) would concur in the result. Justice Sotomayor's and Kavanaugh's view is therefore a logical subset of, and controls over, the plurality's.

5.

Because the controlling opinion in *June Medical Services* clarified that the undue burden standard is not a balancing test, the district court erred in attempting to weigh the benefits of KRS § 216B.0435 and 902 KAR 20:360 § 10 against their burdens. In our review of the challenged provisions, we need only consider whether they are reasonably related to a legitimate state interest and whether they impose a substantial obstacle.

B.

We begin with the threshold requirement that KRS § 216B.0435 and 902 KAR 20:360 § 10 be reasonably related to a legitimate state interest. *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment). The district court, not having the benefit of *June Medical Services*, determined for itself what risks are associated with abortion, to what extent transfer and transport agreements mitigate those risks, and whether the challenged provisions were effective at protecting women's health. To aid the court, the parties presented competing expert witnesses and medical-journal articles. After weighing the conflicting evidence and making its own scientific and medical findings, the district court found that transfer- and transport-agreements do not confer a substantial medical benefit. Accordingly, the district court held that KRS § 216B.0435 and 902 KAR 20:360 § 10 "do not advance a legitimate interest in promoting the health of women seeking abortions in Kentucky." 2018 WL 6444391, at *25. The plaintiffs contend that, even after *June Medical Services*, the district court's findings establish that the challenged provisions are "not reasonably related to a legitimate purpose" and are therefore unconstitutional even if they do not impose a substantial obstacle. Additional Citation of Pls.-Appellees, ECF No. 87, at 2.

The district court's independent weighing of the challenged provisions' asserted benefits does not comport with the "'traditional rule' that 'state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *June Med. Servs.*, 140 S. Ct. at 2136 (Roberts, C.J., concurring in the judgment) (alteration in original) (quoting *Gonzales*, 550 U.S. at 163). The Chief Justice's opinion makes clear that it is not the role of courts to attempt to "objectively assign weight" to "the State's interests" in passing

regulations on abortion, including its interest in "the health of the woman." *Id.* "Pretending that we could pull that off would require us to act as legislators, not judges." *Id.*

For the purposes of this threshold inquiry, it matters not at all whether the district court or we believe the requirements of KRS § 216B.0435 and 902 KAR 20:360 § 10 to be sound policy. Indeed, the Chief Justice noted that an abortion regulation may serve a legitimate purpose even if a court were to determine it "ha[s] little if any benefit." *See id.* at 2137. We are only to ascertain whether the Kentucky General Assembly and the Cabinet had "a rational basis to act." *Gonzales*, 550 U.S. at 158. Under this highly deferential standard of scrutiny, a law "need not," in the court's view, "be in every respect logically consistent with its aims" to be reasonably related to a legitimate government interest. *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955); *see Casey*, 505 U.S. at 885 (joint opinion) (relying on *Lee Optical* to determine that Pennsylvania's informed consent provision served a legitimate purpose). Instead, a reasonable relationship exists if there is a problem "at hand for correction" and "it might be thought that the particular legislative measure was a rational way to correct it." *Lee Optical*, 348 U.S. at 488.

The Chief Justice explained that the Supreme Court has consistently applied this deferential standard in determining whether abortion regulations are reasonably related to a legitimate state interest. *See June Med. Servs.*, 140 S. Ct. at 2136–38 (Roberts, C.J., concurring in the judgment). *Casey* itself held that a state could require that "a physician, as opposed to a qualified assistant, provide information relevant to a woman's informed consent." 505 U.S. at 884 (joint opinion). It did so because "the States" have "broad latitude to decide that particular functions may be performed only by licensed professionals, even if an objective assessment might suggest that those same tasks could be performed by others." *Id.* at 885 (citing *Lee Optical*, 348 U.S. at 483); *see June Med. Servs.*, 140 S. Ct. at 2137 (Roberts, C.J., concurring in the judgment). *Mazurek* likewise held that a law "restricting the performance of abortions to licensed physicians" served a valid purpose. 520 U.S. at 969. In so holding, the Court rejected as irrelevant the respondents' contention that "'all health evidence contradicts the claim that there is any health basis' for the law," resting instead on the broad discretion of states to impose licensing requirements. *Id.* at 973 (citation omitted); *see June Med. Servs.*, 140 S. Ct. at 2138

(Roberts, C.J., concurring in the judgment).  Finally, the Court held in *Gonzales* that the federal ban on partial-birth abortion (i.e. intact dilation and extraction) served a legitimate purpose, even though arguably "the standard D & E is in some respects as brutal, if not more, than the intact D & E."  550 U.S. at 160.  The Court reached that conclusion by determining that "[i]t was reasonable for Congress to think that partial-birth abortion, more than standard D & E," undermined the integrity of the medical profession and respect for human life, not by making its own assessment of the matter.  *Id.*

Applying the same standard here, we cannot say that laws requiring abortion facilities to have transfer and transport agreements with a local hospital are not reasonably related to a legitimate government end.  The district court found that it is *sometimes* necessary to transfer a patient from an abortion facility to an emergency room because of an abortion-related complication.  *See* 2018 WL 6444391, at *11.  There is thus a problem at hand for the Kentucky legislature to correct.  *Lee Optical*, 348 U.S. at 488.  And one could easily see how requiring abortion facilities to have transfer and transport agreements with a local hospital is a "rational way to correct" that problem.  *Id.*  Transfer and transport agreements determine in advance what duties each party has in an emergency and how the patient's information will be transmitted from the abortion facility to the hospital.  It is reasonable to think that fixing these details ahead of time streamlines the treatment of a patient in an emergency, thereby leading to better patient health outcomes.

Indeed, such is the law of our circuit.  In *Baird*, we considered the constitutionality of an Ohio law requiring abortion facilities to "have a written transfer agreement with a local hospital."  438 F.3d at 599.  As in this case, the plaintiffs in *Baird* introduced evidence that their "patients rarely need to be hospitalized," testimony from a physician that "he was not personally aware of a single instance in which the presence of a transfer agreement made a difference in the care a patient received," and expert testimony that "written transfer agreements do not ensure optimum patient care."  *Id.* at 601.  Nevertheless, without delving into the record evidence, we held that Ohio's law "serve[s] a valid purpose," because it "ensure[s]" that each abortion facility "meets certain minimum standards."  *Id.* at 607.  For the same reason, KRS § 216B.0435 and 902 KAR 20:360 § 10 "are 'reasonably related'" to Kentucky's "legitimate state interest" in maternal

health. *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 878 (joint opinion)). The district court, not having the benefit of the *June Medical Services* decision, failed to perform traditional rational-basis review, and erred in holding otherwise.

## C.

Having determined that KRS § 216B.0435 and 902 KAR 20:360 § 10 are reasonably related to a legitimate state interest, we now turn to whether the provisions "ha[ve] the 'effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus.'" *June Med. Servs.*, 140 S. Ct. at 2138 (Roberts, C.J., concurring in the judgment) (quoting *Casey*, 505 U.S. at 877 (joint opinion)).

The district court held that KRS § 216B.0435 and 902 KAR 20:360 § 10 would impose a substantial obstacle for women seeking abortion in Kentucky by leaving the Commonwealth without any operating abortion facility. The plaintiffs have not presented any other basis for concluding that the challenged provisions impose a substantial obstacle. Thus, so long as either EMW or Planned Parenthood would be able to operate with the provisions in effect, we cannot conclude that they impose a substantial obstacle.[11] Kentucky concedes that EMW and Planned Parenthood were not, at the time they applied, able to obtain compliant transfer and transport agreements, but the Commonwealth maintains that both organizations' facilities could operate by obtaining waivers of the provisions' requirements every ninety days under 902 KAR 20:360 § 10(5).[12] Because CHFS promulgated the waiver provision after the parties had already agreed

---

[11]The dissent maintains that the plaintiffs need not establish that both facilities will close, because the closure of just one facility would create an undue burden "if the remaining facility was left unable to meet the demand for abortions." Dissenting Op. at 62 n.16. But the plaintiffs' sole argument on the issue of burdens throughout this litigation has been that the challenged provisions will prevent both EMW and Planned Parenthood from operating, leaving Kentucky with zero operating abortion facilities.

[12]Kentucky also offers several reasons why the challenged provisions would not impose a substantial obstacle even if they were to cause EMW's and Planned Parenthood's facilities in Louisville to close. First, it claims that abortions could still be legally obtained in the Commonwealth at hospitals, ambulatory surgical centers, and physicians' offices. Second, it argues that EMW and Planned Parenthood could begin providing abortions at their facilities in Lexington. Third, the Commonwealth claims that even if women could not obtain abortion in Kentucky, they could obtain abortions in neighboring states. Because we conclude that EMW and Planned Parenthood have not shown that the challenged provisions would cause their Louisville facilities to close, we need not consider these alternative arguments.

to preliminarily enjoin the challenged licensing requirements, EMW and Planned Parenthood never had an opportunity to apply for a waiver. To prevail, therefore, the plaintiffs must make a clear showing that their facilities would close if the waiver provision were given an opportunity to take effect and they "attempted *in good faith*" to obtain waivers. *June Med. Servs.*, 140 S. Ct. at 2141 (Roberts, C.J., concurring in the judgment) (citation omitted).[13] A finding of good faith is "necessary to ensure that the [facilities'] inability to [operate] [would be] attributable to the [challenged provisions] rather than a halfhearted attempt to obtain [waivers]." *Id.*[14]

The district court dismissed the effect of the waiver provision in just two sentences, finding that it would be "exceedingly difficult" for EMW and Planned Parenthood's facilities "to survive" if they had to apply for a waiver every ninety days. 2018 WL 6444391, at *19. This was so, the district court found, because they "would not likely be able to hire and keep staff without knowing whether they could continue operating beyond ninety days, and no prudent organization would risk millions of dollars investing in [an abortion] facility whose temporary license would be based on the administrative whim of the Inspector General." *Id.*

---

[13]The dissent argues that Kentucky cannot rely on the waiver provision to defend the constitutionality of the challenged provisions, because the waiver provision has been preliminarily enjoined from the moment it was promulgated. To obtain a permanent injunction, however, the plaintiffs must show that their patients "will continue to suffer irreparable injury" "[a]*bsent an injunction*," not assuming the waiver provision continues to be enjoined. *Saieg v. City of Dearborn*, 641 F.3d 727, 742 (6th Cir. 2011) (emphasis added); *see also Winter*, 555 U.S. at 20, 32. A court enjoins the enforcement of a law because it has found the law to be unconstitutional, not the other way around.

[14]Relying on *Northland Family Planning Clinic v. Cox*, 487 F.3d 323 (6th Cir. 2006), EMW argues that the waiver provision has no bearing on whether the challenged regulations impose a substantial obstacle because it is merely "a government official's interpretation of an abortion restriction" that CHFS can revoke at any time. In *Cox*, a panel of this court invalidated Michigan's ban on partial-birth abortion because it banned both dilation-and-extraction (D & X) abortions and dilation-and-evacuation (D & E) abortions. *Id.* at 339. Michigan argued that the plaintiffs' challenge was moot because the Michigan attorney general had issued an opinion interpreting the state's ban as applying only to D & X abortions. *Id.* at 341. We disagreed because the attorney general's opinion lacked the force of law under state law; it did not even bind the office of the attorney general. *Id.* at 342. Here, by contrast, 902 KAR 20:360 § 10(5) is a "duly promulgated" regulation; as such, it "ha[s] the force and effect of law." *Faust v. Commonwealth*, 142 S.W.3d 89, 98 (Ky. 2004). Moreover, CHFS is "bound by the regulations it promulgates." *Hagan v. Farris*, 807 S.W.2d 488, 490 (Ky. 1991). Because 902 KAR 20:360 § 10(5) alters the substantive law governing abortion in Kentucky, any claim for injunctive relief EMW may have had based on the effect of the Commonwealth's licensing requirements before the waiver provision was promulgated is moot; that CHFS promulgated 902 KAR 20:360 § 10(5) mid-litigation makes no difference. *See N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1526 (2020) (per curiam).

1.

The district court's findings of fact rest in part on an error of law. The district court presumed that because the issuance of waivers is discretionary, it is a matter of "administrative whim." But "[d]iscretion is not whim," *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005), and a discretionary decision is not one unconstrained by law or objective standards, *see Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1931–32 (2016) ("'[I]n a system of laws discretion is rarely without limits,' even when the statute 'does not specify any limits upon the [agency's] discretion.'" (first alteration in original) (citation omitted)). In determining whether to grant a waiver to an abortion facility, the Inspector General must consider (1) whether the facility is making "a good faith effort to obtain a transfer or transport agreement," (2) whether the facility "can provide the same level of patient care and safety via alternative health services during any extension period," and (3) the facility's history of regulatory compliance. 902 KAR 20:360 § 10(5)(b); *see Hagan v. Farris*, 807 S.W.2d 488, 490 (Ky. 1991) ("An agency must be bound by the regulations it promulgates."). If the Inspector General denies an application for a waiver, an abortion facility may seek administrative review of the denial and ultimately judicial review in state court. *See* 902 KAR 20:360 §§ 4(2)–(3), 10(5)(f); *Lindall v. Ky. Ret. Sys.*, 112 S.W.3d 391, 394 (Ky. Ct. App. 2003) (explaining that a court can reverse an administrative decision "if the agency acted arbitrarily or outside the scope of its authority, if the agency applied an incorrect rule of law, or if the decision itself is not supported by substantial evidence in the record"); *Commonwealth v. Frasure's Riverview Pers. Care Home*, No. 2012-CA-002128-MR, 2014 WL 97472, at *4 (Ky. Ct. App. Jan. 10, 2014) (holding that a hearing denial by CHFS "was arbitrary and capricious").

Absent "clear evidence to the contrary," we must "presume that [public officials] have properly discharged their official duties." *United States v. Martin*, 438 F.3d 621, 634 (6th Cir. 2006) (alteration in original) (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)); *see also U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[A] presumption of regularity attaches to the actions of Government agencies."); *Jones v. FBI*, 41 F.3d 238, 242 (6th Cir. 1994) ("[A]gency actions . . . are normally entitled to a presumption of good faith."); *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750, 756 (8th

Cir. 2018) (holding that courts must presume state officials will act in good faith when state law grants them discretion to waive regulations on abortion facilities). The district court made no findings of fact as to whether the Inspector General would act in good faith; instead it assumed that the Inspector General would act based on "whim." But we must presume that the Inspector General will consider waiver applications in good faith and will not act "simply to make it more difficult for [women] to obtain an abortion." *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456, 461 (6th Cir. 1999).[15]

"Because the record is practically devoid of any information on the mechanics of the Waiver Provision," and because we must presume good faith, we simply have "no way" of determining how the Inspector General will act on waiver applications. *Hawley*, 903 F.3d at 756. We cannot rule out the possibility that he will grant EMW and Planned Parenthood quarterly waivers as a matter of course. And because the plaintiffs bear the burden of making a "clear showing" of an "actual" constitutional violation, *Winter*, 555 U.S. at 22, 32, and of a "continuing irreparable injury," *Baird*, 438 F.3d at 602 (citation omitted), they must establish that both EMW and Planned Parenthood would be unable to operate on the basis of waivers *even if* they could reasonably expect to obtain a new waiver every ninety days.[16]

2.

Turning now to the facts, no evidence supports the district court's finding that Planned Parenthood would be unable to operate on the basis of quarterly waivers. Planned Parenthood's only evidence at trial addressing this issue was the testimony of Kimberly Greene, the Chair of the Board of Directors of Planned Parenthood of Indiana and Kentucky. Greene never testified that Planned Parenthood would be unable to hire or retain staff if it had to rely on waivers to

---

[15]We note, moreover, that since the election of Governor Beshear, the Cabinet has reversed its position that Planned Parenthood had illegally performed abortions in December 2015 and January 2016, voluntarily dismissed its lawsuit against Planned Parenthood despite prevailing at the Kentucky Court of Appeals, and rescinded, on its own initiative, its August 2019 denial of Planned Parenthood's license application. These actions cannot be squared with an assertion that the Inspector General will act simply to make it more difficult for women to obtain abortions.

[16]The dissent faults the Commonwealth for failing to produce affirmative evidence that the plaintiffs will be able to operate under quarterly waivers, but it is the plaintiffs' burden to show the existence of a constitutional violation, not the Commonwealth's burden to show the absence of one. The plaintiffs accordingly must show that they will not be able to operate on the basis of waivers, as Planned Parenthood conceded at oral argument. *See* Oral Arg. Audio at 37:35–42.

retain its license.**17**   Instead, she testified that she did not believe Planned Parenthood "would have been able to raise money" for its Louisville facility if its board had known it "would only get a 90-day provisional license."  Tr. Trans., Vol. 2B, R. 116, PageID 4304.  But that facility was already built and outfitted at the time of trial, and Planned Parenthood performs abortions there now.  Greene's counterfactual discussion of past events has no bearing on the prospective effect of the challenged provisions.  As the district court itself observed at trial:

> THE COURT:  All right.  I want to make sure I understand this.  The money has been raised.  The facility has been built.  It's been equipped.  And at this point not only is the facility operational, but you-all did actually perform abortion services there prior to getting the letter on January 28th?
>
> THE WITNESS [Greene]: That's right.

*Id.* at PageID 4305.  When asked on cross-examination why Planned Parenthood would "not ask for a time extension [i.e. a ninety-day waiver] and see what happens," Greene responded, "Maybe we will."  *Id.* at PageID 4321.

None of this testimony supports the finding that Planned Parenthood would be unable to operate if it applied for quarterly waivers while seeking transfer and transport agreements.  If anything, Greene's testimony on cross-examination suggests that Planned Parenthood itself had not ruled out the possibility of operating on that basis.  Accordingly, the district court's finding as to Planned Parenthood was clearly erroneous.  *See United States v. Mahaffey*, 53 F.3d 128, 133 (6th Cir. 1995) (holding that a finding that "totally lacks an evidentiary basis in the record . . . is clearly erroneous").  Because the plaintiffs have failed to show that KRS § 216B.0435 and 902 KAR 20:360 § 10 would prevent Planned Parenthood from performing abortions in its Louisville facility, they have failed to show that the challenged provisions would leave Kentucky without a licensed abortion facility.  Accordingly, they have not shown that the statute and regulation would have the effect of imposing a substantial obstacle to abortion access in Kentucky.

---

**17**The dissent claims that testimony from EMW's owner that EMW would not be able to retain staff is sufficient to establish that *Planned Parenthood* would not be able to retain staff.  The undue burden standard, however, requires an individuated assessment of each abortion provider's ability to comply with licensing regulations.  If that were not the case, it hardly would have been necessary for the plurality in *June Medical Services* to painstakingly analyze each abortion doctor in Louisiana's ability to comply with the requirements at issue in that case.  *See* 140 S. Ct. at 2122–28 (plurality opinion); *id.* at 2141 (Roberts, C.J., concurring in the judgment).

Moreover, even if we disregarded Planned Parenthood, the district court's finding that EMW would not be able to operate by applying for quarterly waivers is clearly erroneous as well. The district court relied for its finding on the trial testimony of Dr. Marshall. When asked whether EMW would be able to operate by applying for a waiver every ninety days, Dr. Marshall testified:

> Well, I think the problem is that your license is at stake every 90 days, so you're at the whim of being closed every 90 days. There's no security that you can even—you can't offer a person a job and say, "Well, I have you a job for 90 days, but I don't know if I'm going to have you a job past that." We wouldn't be able to hire any staff.

Tr. Trans., Vol. 1B, R. 112, PageID 4121. In response to subsequent questioning, Dr. Marshall acknowledged that his answer contradicted his deposition testimony. He continued:

> . . . I've thought about what you asked me a lot, and my answer has changed since then. . . . Because at that time I was just thinking about the technicality of it, not the ramifications. And once I thought about the ramifications, then it would be burdensome.

*Id.* at PageID 4122.

Dr. Marshall's testimony rests on the assumption that EMW would be "at the whim of being closed every 90 days" if it relied on quarterly waivers. Accepted as true, this establishes only that EMW would be unable to retain staff if the Inspector General's decision on whether to grant a waiver were arbitrary. As we explained above, however, as a matter of law we may not make that assumption.

And even if we were to accept the district court's legally erroneous assumption, Dr. Marshall's testimony would still be too conclusory to make a clear showing that a "*good faith*" (and not merely "halfhearted") attempt to operate on quarterly waivers would be futile. *See June Med. Servs.*, 140 S. Ct. at 2141 (Roberts, C.J., concurring in the judgment). The substantial-obstacle determination in *June Medical Services* turned on whether the district court had clearly erred in finding that three Louisiana abortion doctors who were unable to obtain admitting privileges at a local hospital had made good-faith efforts to do so. *See id.* at 2124–28 (plurality opinion); *id.* at 2141 (Roberts, C.J., concurring in the judgment) (endorsing the

plurality's discussion of the physicians' efforts to obtain admitting privileges). All three made some attempt to comply. From the plurality's close examination of the record to determine what each doctor did and did not do to obtain admitting privileges, we can see that while "[g]ood faith does not require an exercise in futility," *id.* at 2128 (plurality opinion), a finding of futility requires more than an abortion provider's subjective belief that efforts at compliance would be futile. The provider's belief must be "reasonabl[e]," and the reasonableness of the belief must be established by record evidence. *Id.* at 2125.

Here, the record evinces only Dr. Marshall's subjective belief that it would be impractical to operate on the basis of quarterly waivers. No evidence in the record speaks to whether that belief is objectively reasonable. There is no indication, for instance, that Dr. Marshall asked any current employees whether they would be willing to remain on staff if EMW were to operate on the basis of waivers. Nor is there any evidence that he sought replacements for any critical staff members he would be likely to lose, if he would be likely to lose any. Nor does the record contain any other specific facts that would give rise to the inference that it would be pointless to attempt to retain or hire staff. Without relevant evidence in the record, we simply cannot know whether an abortion provider making a wholehearted effort to comply with the waiver provision would reasonably conclude that he would be unable to maintain a staff.[18]

Despite our explicit reliance on the plurality opinion in *June Medical Services* (endorsed, in this part, by Chief Justice Roberts), the dissent curiously accuses us of relying on Justice Alito's dissent. A review of the plurality's substantial-obstacle determination in *June Medical Services* shows why this is wrong.

As noted above, the question in *June Medical Services* was whether three Louisiana abortion doctors had made good-faith efforts to obtain hospital admitting privileges. The district court, "after monitoring the doctors' efforts for a year and a half," determined that they had. *Id.*

---

[18]We note that both of the physicians who perform abortions at EMW alongside Dr. Marshall are also professors at the University of Louisville School of Medicine. If they have an alternative source of employment and only perform abortions at EMW part time, would they necessarily be unwilling to continue working there if EMW had to rely on waivers to keep its license? Or if keeping physicians on staff is not the problem, which position would EMW not be able to fill? We have no way of knowing the answers to these questions from Dr. Marshall's testimony, nor do we know whether Dr. Marshall asked himself these sorts of questions before concluding that EMW would be unable to retain staff.

at 2124 (plurality opinion).  The Supreme Court plurality, and Chief Justice Roberts, agreed.  *Id.*; *id.* at 2141 (Roberts, C.J., concurring in the judgment).  But not before devoting many pages of the U.S. Reports to a doctor-by-doctor, and hospital-by-hospital, analysis of the record evidence supporting each physician's claim of futility.**[19]**  *Id.* at 2124–28 (plurality opinion).

We take the plurality's painstaking review of the evidence supporting the district court's determination that each doctor acted in good faith as our model.  From that example, we learn that good-faith efforts to comply with the law matter; that record evidence must support a physician's assertion of futility; and that appellate courts should do as the Supreme Court plurality did—review the record for some support of the claim.  We have done that here.  What this record contains is a legally erroneous assumption that the Inspector General would act in bad faith and an unsupported assertion from Dr. Marshall that he could not operate with such uncertainty.  That is a far cry from the evidence that the plurality deemed sufficient to support the substantial-obstacle determination in *June Medical Services.*  Justice Alito, to be sure, would have demanded more.  *Id.* at 2158–65 (Alito, J., dissenting).  We are not sure why that matters; it does not follow that the plurality would have been satisfied with less.  The plurality's careful look at each doctor's efforts is our guide.  Guided by the analysis of the plurality opinion, the evidence in this case was insufficient to establish a good-faith attempt, even under the deferential clearly erroneous standard.

---

**[19]**To illustrate: The plurality noted that in response to Doe 2's application, the Willis-Knighton Health Center sent a letter requiring him "to submit records of *hospital* admissions" in order to establish his eligibility, "even though he had not 'done any in-hospital work in ten years.'"  *June Med. Servs.*, 140 S. Ct. at 2125 (citation omitted) (plurality opinion).  "The record also show[ed] that Doe 2 could not have maintained the 'adequate number of inpatient contacts' Willis-Knighton requires to support continued privileges."  *Id.*  "Doe 2" therefore "reasonably believed there was no point in" continuing to pursue admission privileges there.  *Id.*  Doe 5 needed a covering physician at the hospital to obtain admitting privileges so he asked "the doctor" with whom his "clinic already had a patient transfer agreement."  *Id.* at 2126.  That doctor declined because he "worried that it could make him a target of threats and protests."  *Id.*  Doe 5 knew that other physicians with whom he had a less-established relationship would likely raise the same objection, because "[a]nti-abortion protests had previously forced him to leave his position as a staff member of a hospital northeast of Baton Rouge."  *Id.*  "With his own experience and their existing relationship in mind, Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would."  *Id.*  Finally, "Doe 6 testified that he did not apply to other hospitals because he did not admit a sufficient number of patients to receive active admitting privileges."  *Id.* at 2127.  "The State's own admitting-privileges expert . . . testified that a doctor in Doe 6's position would 'probably not' be able to obtain 'active admitting and surgical privileges' at any hospital," and both witness's testimony was "well-supported" by other evidence in the record.  *Id.* at 2127–28 (citation and emphases omitted).  Doe 6 therefore acted in good faith as well.  *Id.* at 2128.

We are thus "left with the definite and firm conviction that a mistake has been committed." *Id.* at 2141 (Roberts, C.J., concurring in the judgment) (quoting *Gypsum*, 333 U.S. at 395). There was insufficient evidence for the district court to find that it would be futile for EMW to make a "*good faith*" attempt to operate on the basis of ninety-day waivers. *Id.* The plaintiffs have failed to show that EMW's inability to operate on the basis of waivers would be properly "attributable to the [challenged provisions] rather than a halfhearted attempt" to comply with the waiver provision, even if we indulge the improper assumption on which Dr. Marshall's testimony is premised. *Id.*

EMW and Planned Parenthood have failed to make a clear showing that *both* of their abortion facilities would close if KRS § 216B.0435 and 902 KAR 20:360 § 10 go into effect. But that is the showing they must make. The district court's permanent injunction was based on the assumption that the regulations requiring transport and transfer agreements would impose an undue burden on the right to abortion by leaving Kentucky without an operating abortion facility. That conclusion cannot be sustained. Accordingly, we reverse the district court's judgment in favor of the plaintiffs on their substantive due process claims, and we vacate the permanent injunction. The district court should consider on remand the plaintiffs' remaining claims for relief.

III.

One final matter requires resolution. During discovery, Kentucky failed to produce a representative from the Governor's Office for a deposition properly noticed by Planned Parenthood. Planned Parenthood moved for sanctions. A magistrate judge granted Planned Parenthood's motion and ordered the Governor's Office to reimburse Planned Parenthood for the reasonable expenses caused by its failure to appear. *EMW Women's Surgical Ctr., P.S.C. v. Glisson*, No. 3:17CV-00189-GNS, 2017 WL 4897528, at \*5 (W.D. Ky. Oct. 30, 2017). Planned Parenthood then submitted a bill of costs to the district court. Rejecting Kentucky's objections to both the bill of costs and the magistrate judge's order, the district court awarded Planned Parenthood $21,140.25 in attorney's fees and costs. *EMW Women's Surgical Ctr., P.S.C. v.*

*Bevin*, No. 3:17-CV-189-GNS, 2018 WL 10229473, at *9 (W.D. Ky. Sept. 28, 2018).[20] Kentucky appeals, contesting both the decision to order sanctions and the amount of the award.

A district court may order sanctions if "a party . . . fails, after being served with proper notice, to appear for that person's deposition." Fed. R. Civ. P. 37(d)(1)(A)(i). Such a failure "is not excused on the ground that the discovery sought was objectionable, unless the party failing to act has a pending motion for a protective order under Rule 26(c)." Fed. R. Civ. P. 37(d)(2). When a district court orders sanctions under Rule 37(d), it "must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3). "A district court's decision to invoke Rule 37 sanctions is reviewed by this court for an abuse of discretion." *McCarthy v. Ameritech Publ'g, Inc.*, 763 F.3d 488, 490 (6th Cir. 2014) (quoting *Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 551 (6th Cir. 1994)).

Relying on Rule 37(d)(2), Kentucky argues that a party's failure to appear is always excused if the party has a pending motion for a protective order; and here the Commonwealth had filed a motion for a protective order the night before the deposition. But having a pending protective order is merely a necessary condition for excusing a party's failure to appear. It is not alone sufficient. *See* Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment ("[Rule 37(d)(2) was] added to make clear that a party may not properly remain completely silent even when he regards a notice to take his deposition . . . as improper and objectionable. If he desires not to appear or not to respond, he must apply for a protective order."); *Albert v. Starbucks Coffee Co.*, 213 F. App'x 1, 2 (D.C. Cir. 2007) (per curiam) (rejecting "the proposition that the mere filing of a motion for protective order *requires* the court to excuse a party's failure to obey a court order compelling attendance at a deposition"). The district court did not abuse its

---

[20]Planned Parenthood actually requested $21,190.25 in its bill of costs. The district court found that "Planned Parenthood requests $19,395 in attorneys' fees . . . and $1,795.25 for airfare and hotel costs," adding up to $21,190.25. 2018 WL 10229473, at *4. The district court determined that both of these sums were reasonable, *id.* at *8, but its order at the end of the opinion awards Planned Parenthood $50 less, $21,140.25, *see id.* at *9 (awarding "$19,395.00 in attorneys' fees and $1,745.25 in costs"). This $50 discrepancy appears to be a clerical error.

discretion by taking into account the last-minute nature of Kentucky's motion for a protective order.

Kentucky further contends that the Governor's Office was substantially justified in failing to send a representative because one of its attorneys, Jennifer Wolsing, was not timely notified of Planned Parenthood's notice of deposition. Even assuming this allegation is true, it is irrelevant. The magistrate judge found that Planned Parenthood had served a notice of deposition on two other attorneys for the Governor's Office more than two weeks before the scheduled deposition. Kentucky does not challenge this finding on appeal. A deposing party "must give reasonable written notice to every other *party*," not every *attorney*. Fed. R. Civ. P. 30(b)(1) (emphasis added); *see also* Fed. R. Civ. P. 5(a)(1). "When a party is represented by more than one attorney, service upon any one of them satisfies" this requirement. 4B Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1145 (4th ed. 2008, Apr. 2020 update); *accord Buchanan v. Sherrill*, 51 F.3d 227, 228 (10th Cir. 1995) (per curiam); *Daniel Int'l Corp. v. Fischbach & Moore, Inc.*, 916 F.2d 1061, 1063 (5th Cir. 1990).

Turning to the amount of the award, Kentucky objects to paying the travel costs of Karen Johnson-McKewan, Planned Parenthood's lead counsel. The Commonwealth claims that she did not need to fly from California to Kentucky because counsel for the Governor's Office had clearly communicated that no representative would attend the deposition. If the only purpose of the trip was to make a record that the Governor's Office did not appear, Kentucky argues, Planned Parenthood could have relied on local counsel instead. Although "reasonable expenses" under Rule 37(d)(3) do not include "expenses and fees" that "could have been avoided and were self-imposed," *INVST Fin. Grp., Inc. v. Chem-Nuclear Sys., Inc.*, 815 F.2d 391, 404 (6th Cir. 1987), here it was reasonable for Johnson-McKewan to travel to Kentucky. Both parties knew that the Governor's Office had a duty to send a representative under threat of sanction. Planned Parenthood "could reasonably have believed that [the Governor's Office] might consider the consequences of failing to attend and change [its] mind." *John Wiley & Sons, Inc. v. Book Dog Books, LLC*, 298 F.R.D. 145, 151 (S.D.N.Y. 2014). It was thus reasonable for Planned Parenthood to prepare fully for the deposition and send its lead counsel in case the Governor's Office decided to appear.

Kentucky also claims it was excessive for Planned Parenthood to bill 23.5 hours for the time spent on its sanctions motion and 20 hours for the reply in support of it. Those figures do seem high, but the district court determined them to be reasonable after considering "[t]he content and quality" of the filings in detail. 2018 WL 10229473, at *7. Kentucky presents no argument why the time was excessive beyond italicizing the numbers involved and asserting that they are too high. We cannot conclude that the district court abused its discretion in awarding $21,140.25 in fees and costs.

* * *

For the foregoing reasons, we AFFIRM the district court's award of sanctions, REVERSE its judgment in favor of the plaintiffs' substantive due process claims, VACATE the permanent injunction, and REMAND for further proceedings consistent with this opinion.

––––––––––––––––––

**DISSENT**

––––––––––––––––––

CLAY, Circuit Judge, dissenting.  Today, the majority openly disregards our standard of review and discards binding precedent.  In doing so, it condones the evisceration of the constitutional right to abortion access in Kentucky.

This case presents the straightforward issue of whether Kentucky's requirement that abortion facilities enter into both a transfer agreement with a Kentucky-licensed acute-care hospital and a transport agreement with a Kentucky-licensed ambulance service constitutes an undue burden on abortion access.  *See* Ky. Rev. Stat. ("KRS") § 216B.0435; 902 Ky. Admin. Regs. ("KAR") 20:360 § 10.  In the last five years, the Supreme Court has twice found laws imposing lesser burdens unconstitutional in violation of the Fourteenth Amendment.  *June Med. Servs. v. Russo*, 140 S. Ct. 2103, 2112–13 (2020) (plurality opinion); *id.* at 2134 (Roberts, C.J., concurring); *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2300 (2016).  Yet the majority refuses to recognize the burden imposed on women by Kentucky's requirement, claiming that the district court clearly erroneously found that this requirement would effectively eliminate abortion access in the Commonwealth.  Instead, the majority contends—without grounding in fact or reason—that Kentucky's abortion facilities could continue to provide abortions if they continually and indefinitely applied for ninety-day extensions of the deadline to obtain transfer and transport agreements.  *See* 902 KAR 20:360 § 10(5).  To reach that end, it disregards substantial evidence supporting the district court's determination, as well as basic common sense and logical reasoning.

More perilously, the majority altogether refuses to apply—let alone adhere to—the Supreme Court's decision in *Whole Woman's Health v. Hellerstedt*.  Instead, it wrongly adopts an analysis put forward in dicta by Chief Justice Roberts' concurring opinion in *June Medical Services v. Russo*, and then reaches a result directly opposing Chief Justice Roberts'.  In doing so, the majority completely undermines the principle driving that concurrence—*stare decisis*—

and ignores Supreme Court precedent dictating that lower courts should not find the Court to have implicitly overruled prior precedent. *See Agostini v. Felton*, 521 U.S. 203, 237 (1997).

At the end of the day, no matter what standard this Court is bound to apply, the majority's decision today is terribly and tragically wrong. The majority directly contravenes both the plurality and concurring opinions in *June Medical Services*, as well as the majority opinion in *Whole Woman's Health*. Correctly analyzed, the record and the law definitively demonstrate that Kentucky's transfer and transport agreement requirements impose an undue burden under any possible analysis. And the consequences of today's decision could not be more dire. As a result of the majority's deeply flawed analysis, millions of individuals will be altogether deprived of abortion access.

## BACKGROUND

At issue in this case is a Kentucky statute and regulation that together require abortion facilities to enter into both a transfer agreement with a Kentucky-licensed acute-care hospital and a transport agreement with a Kentucky-licensed ambulance service. *See* KRS § 216B.0435; 902 KAR 20:360 § 10. KRS § 216B.0435 has been in place since 1998, and states:

(1) Each abortion facility shall enter into a written agreement with a licensed acute-care hospital capable of treating patients with unforeseen complications related to an abortion facility procedure by which agreement the hospital agrees to accept and treat these patients.

(2) If unforeseen complications arise prior to or during an abortion facility procedure, the patient shall be transferred to the licensed acute-care hospital with which the abortion facility has a written agreement as provided under subsection (1) of this section or the hospital selected by the patient, if the patient so chooses.

(3) Each abortion facility shall enter into a written agreement with a licensed local ambulance service for the transport of any emergency patient within the scope of subsection (1) of this section to the licensed acute-care hospital.

(4) The written agreements of an abortion facility with an acute-care hospital and with a local ambulance service shall be filed by the abortion facility with the [Cabinet for Health and Family Services].

The regulation 902 KAR 20:360 § 10 was enacted in 1999 and, until 2017, nearly mirrored this statute.

However, in 2017, the Commonwealth's Cabinet for Health and Family Services ("CHFS") promulgated a new version of the regulation. CHFS is part of Kentucky's executive branch and is responsible for the administration and enforcement of Kentucky's abortion facility licensure requirements, in part through the Office of the Inspector General ("OIG"). The new regulation required abortion facilities to enter into transfer and transport agreements with very particular hospitals and ambulance services. Both must either be in the same county as the abortion facility or within a certain number of miles or minutes' drive—the hospital within twenty minutes normal driving time, and the ambulance service within ten minutes or a five-mile distance. 902 KAR 20:360 §§ 10(3)(a), (4)(a). Likewise, the new regulation established very particular requirements for the transfer and transport agreements between abortion facilities and those hospitals and ambulance services. The transfer and transport agreements must detail numerous specified responsibilities of the abortion facility, hospital, and ambulance service and must be signed by individuals who certify that they have the authority to execute such agreements on the organization's behalf. *Id.* §§ 10(3)(c)–(f), 10(4)(b)–(c).

If an abortion facility does not enter into both a transfer agreement and a transport agreement in accordance with these provisions, it will lose its (or be unable to obtain a) license to perform abortions in Kentucky. KRS § 216B.990. A facility may receive ninety-day extensions of the time provided to comply with these provisions by submitting a written request to the OIG. 902 KAR 20:360 § 10(5). Such a request must certify under oath that the facility "has exhausted all reasonable efforts to obtain a transfer or transport agreement for a continuous ninety (90) calendar day period prior to the request" and must describe in detail "the efforts taken to secure the agreements." *Id.* § 10(5)(a). The Inspector General may grant or deny an extension based on "all factors" he or she "deems relevant under the circumstances," but must consider at least whether the facility "made, and continues to make, a good faith effort to obtain a transfer or transport agreement," whether the facility "can provide the same level of patient care and safety via alternative health services" during the extension period, and the regulatory compliance history of the facility and any other facility "owned, in whole or in part, by the applicant or any other individual or entity having an ownership interest with the facility." *Id.* § 10(5)(b). The Inspector General can rescind his or her grant of an extension "at any time" that he or she determines the facility has not met or is not meeting these requirements. *Id.* § 10(5)(e).

Plaintiff EMW Women's Surgical Center, P.S.C. ("EMW") was—at the time of this lawsuit's initiation and the district court's trial—Kentucky's only licensed abortion facility. It has been performing abortions at its facility in Louisville, Kentucky since the early 1980s, and performs an average of 3,000 abortions per year, which historically has accounted for the overwhelming majority of abortions performed in Kentucky. For instance, in 2016, the latest year for which data was available at the time of trial, EMW performed 2,833 out of 2,848—or 99.47%—of abortions received by Kentuckians in the Commonwealth. Plaintiff Ernest Marshall, M.D. is the owner of EMW.

Plaintiff Planned Parenthood of Indiana and Kentucky, Inc. ("Planned Parenthood") is a non-profit healthcare provider that has been providing healthcare services at its facility in Louisville, Kentucky since 1933. In 2015, Planned Parenthood applied to become a licensed abortion facility. Between December 2015 and January 2016, Planned Parenthood performed twenty-three abortions at its facility, ostensibly as part of the license application process. Since the district court issued its decision in this case, Planned Parenthood has been granted a license to perform abortions in the Commonwealth and has begun doing so.

Prior to the events underlying this case, KRS § 216B.0435 had been in effect for approximately nineteen years without issue. During that time, abortion facility transfer and transport agreements were largely a formality and did not receive serious scrutiny from CHFS during the license application process. Indeed, from the enactment of KRS § 216B.0435 until 2016, it appears that CHFS never found a single transfer or transport agreement to be deficient for any reason. Accordingly, EMW maintained a transfer agreement with the University of Louisville Hospital ("Louisville Hospital") and a transport agreement with Mercy Ambulance Services. And Planned Parenthood, as part of the license application process, entered into a transfer agreement with Louisville Hospital and a transport agreement with Louisville Metro Emergency Medical Services. Neither EMW nor Planned Parenthood had any difficulties entering into or maintaining these agreements prior to 2016.

However, beginning in 2016, CHFS made an about-face and dramatically increased its scrutiny of abortion facility transfer and transport agreements. For instance, CHFS asked Planned Parenthood to revise its transfer agreement with Louisville Hospital so that it included

more specific language about the responsibilities of each party. CHFS also asked Planned Parenthood to provide an extensive list of additional records in support of its transfer and transport agreements, including a fire marshal certificate and certain personnel records. Planned Parenthood complied.

Shortly thereafter, Louisville Hospital terminated its transfer agreement with Planned Parenthood. Planned Parenthood then attempted to enter into transfer agreements with the other hospitals in Louisville, but none agreed. Accordingly, Planned Parenthood instead entered into transfer agreements with the University of Kentucky Hospital in Lexington, Kentucky and Clark Memorial Hospital in Jeffersonville, Indiana. However, CHFS rejected both of these agreements on the grounds that the University of Kentucky Hospital was seventy miles away from Planned Parenthood, and that Clark Memorial Hospital, though only four miles away from Planned Parenthood, was not a Kentucky-licensed hospital. At this point, CHFS was still operating under the version of 902 KAR 20:360 § 10 that mirrored KRS § 216B.0435. Because of its inability to enter into a satisfactory transfer agreement until after the district court's permanent injunction of KRS § 216B.0435 and 902 KAR 20:360 § 10, Planned Parenthood was unable to obtain a license to perform abortions in Kentucky.

Similarly, in early 2017, CHFS informed EMW that its transfer agreement with Louisville Hospital was deficient for several reasons. Specifically, CHFS informed EMW that the agreement was not signed by an acceptable representative of Louisville Hospital, did not correctly name Louisville Hospital as the transferee, and did not state with reasonable certainty the responsibilities of each party in the event the agreement was employed. In an effort to remedy these purported deficiencies, EMW obtained the signature of the President and CEO of Louisville Hospital. However, he cancelled the transfer agreement on the same day, stating that he was concerned he did not have the authority to sign the agreement. EMW attempted to enter into transfer agreements with the other hospitals in Louisville, but none agreed. Although every Louisville hospital that Planned Parenthood and EMW contacted refused to enter into a transfer agreement with them, each confirmed that it would provide emergency medical care to any of their abortion patients if they were transferred there. Nevertheless, because of its inability to

enter into a sufficient transfer agreement, EMW faces revocation of its license to perform abortions in Kentucky.

Plaintiffs EMW and Dr. Marshall then filed this lawsuit against then-Secretary of CHFS Vickie Yates Brown Glisson in her official capacity.  Now-Acting Secretary of CHFS Eric Friedlander has since been substituted for Glisson.  Planned Parenthood later intervened in the lawsuit, alleging claims against both the Secretary and then-Governor Matthew Bevin in their official capacities.  Current Governor Andrew Beshear has since been substituted for Bevin. This Court also recently permitted Kentucky Attorney General Daniel Cameron to intervene as a defendant in this suit.

Plaintiffs' complaints both allege, among other claims, that Kentucky's requirement that abortion facilities enter into both a transfer agreement with a Kentucky-licensed acute-care hospital and a transport agreement with a Kentucky-licensed ambulance service unduly burdens individuals' right to elect abortion, in violation of the Fourteenth Amendment to the United States Constitution.  Plaintiffs seek facial and as-applied injunctive relief.

The district court entered a temporary restraining order that enjoined the enforcement of KRS § 216B.0435 and 902 KAR 20:360 § 10, which was later converted into a preliminary injunction pending the outcome of the lawsuit.  Months after the initiation of this lawsuit and the entry of the preliminary injunction, and even longer after CHFS began heightening its scrutiny of abortion facilities' transfer and transport agreements, CHFS promulgated the version of 902 KAR 20:360 § 10 in place today.  In particular, the newly amended regulation added the ninety-day extension provision.  The district court then conducted a bench trial, and on September 28, 2018, converted its preliminary injunction into a permanent injunction, concluding that the relevant law and regulation indeed imposes an undue burden on abortion access, in violation of the Fourteenth Amendment.

This appeal followed.

**DISCUSSION**

The Supreme Court has twice considered—and twice found unconstitutional—laws imposing burdens lesser than those presented in this case. *See June Med. Servs.*, 140 S. Ct. at 2112–13 (plurality opinion); *id.* at 2134 (Roberts, C.J., concurring); *Whole Woman's Health*, 136 S. Ct. at 2300. Although my colleagues make every effort to assert otherwise, under any possible interpretation, that precedent requires us to affirm the district court's decision in this case.

Plaintiffs are "entitled to a permanent injunction if [they] can establish that [they] suffered a constitutional violation and will suffer 'continuing irreparable injury' for which there is no adequate remedy at law."[1] *EMW Women's Surgical Ctr. v. Friedlander*, 960 F.3d 785, 793 (6th Cir. 2020) (quoting *Women's Med. Pro. Corp. v. Baird*, 438 F.3d 595, 602 (6th Cir. 2005)). In reviewing the district court's decision to permanently enjoin KRS § 216B.0435 and 902 KAR 20:360 § 10, "we apply three standards of review. We review the scope of injunctive relief for an abuse of discretion, the district court's legal conclusions *de novo*, and the court's factual findings for clear error." *Id.*

This Court has repeatedly emphasized that our role on review "is a narrow one." *Am. Civil Liberties Union of Ohio v. Capitol Square Review & Advisory Bd.*, 243 F.3d 289, 309 (6th Cir. 2001) (en banc). "[A]s a lower federal court," we must "apply all pertinent Supreme Court precedent." *United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (quoting *Rosales-Garcia v. Holland*, 322 F.3d 386, 414 (6th Cir. 2003)). To the extent that we disagree with such precedent, we must "leave the Supreme Court to overrule its own decisions." *Zagorski v. Mays*, 907 F.3d 901, 905 (6th Cir. 2018).

Likewise, as an appellate court, we must "let district courts do what district courts do best—make factual findings—and steel ourselves to respect what they find." *Taglieri v. Monasky*, 907 F.3d 404, 408 (6th Cir. 2018) (en banc). As Chief Justice Roberts himself emphasized in his concurring opinion in *June Medical Services*, "[c]lear error review follows

---

[1]Both the majority opinion and this dissent agree that Plaintiffs unquestionably have standing to seek this injunction. *June Med. Servs.*, 140 S. Ct. at 2118–120 (plurality opinion); *id.* at 2139 n.4 (Roberts, C.J., concurring).

from a candid appraisal of the comparative advantages of trial courts and appellate courts. 'While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living.'" 140 S. Ct. at 2141 (Roberts, C.J., concurring) (quoting *Taglieri*, 907 F.3d at 408). Thus, we "will not disturb the factual conclusions of the trial court unless we are 'left with the definite and firm conviction that a mistake has been committed,'" *id.* (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)), or more evocatively, those findings "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish," *Taglieri*, 907 F.3d at 409 (quoting *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990)). "Where there are two permissible views of the evidence, the [district court's] choice between them cannot be clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985).

Today, the majority usurps the district court's duly defined role and casts aside our standard of review. When properly undertaken, a review of the district court's decision leads to the unavoidable conclusion that we must affirm.

## I.

This case turns entirely on whether Plaintiffs suffered a constitutional violation—that is, on whether KRS § 216B.0435 and 902 KAR 20:360 § 10 constitute an undue burden on abortion access, in violation of the Fourteenth Amendment to the United States Constitution. For nearly fifty years, this nation's courts have recognized individuals' fundamental right to choose to have an abortion before fetal viability. *Roe v. Wade*, 410 U.S. 113, 153–54 (1973). We have also recognized that "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on [that] right." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 878 (1993) (plurality opinion).

As explained in *Whole Woman's Health* and reaffirmed by a plurality of the Court in *June Medical Services*, in deciding whether a law or regulation presents a substantial obstacle, courts must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S. Ct. at 2309; *accord June Med. Servs.*, 140 S. Ct. at 2120 (plurality opinion). However, as detailed in Chief Justice Roberts' concurring

opinion in *June Medical Services*, he understands the relevant test somewhat differently. 140 S. Ct. at 2135, 2138 (Roberts, C.J., concurring). Under his analysis, a law must first be "'reasonably related' to a legitimate state interest." *Id.* at 2135 (quoting *Casey*, 505 U.S. at 878). A court may consider a law's benefits in deciding if it meets this "threshold requirement." *Id.* at 2138. If it does, a court must also consider whether the law creates a substantial obstacle to abortion access. *Id.* Laws that create such an obstacle, regardless of their threshold relationship to a state's interest, impose an undue burden on abortion access in violation of the Fourteenth Amendment. *Id.*

Today, the majority casts aside *Whole Woman's Health* in favor of Chief Justice Roberts' concurring opinion in *June Medical Services*, invoking *Marks v. United States*, 430 U.S. 188 (1997), to reach this desired end.[2] But its analysis is deeply flawed and its rejection of *Whole Woman's Health* cannot be justified. In *Marks*, the Supreme Court explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" *Id.* at 193 (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n.15 (1976)). We have interpreted this to mean that "this court must follow the reasoning of the concurring opinion with the narrowest line of reasoning" that is "capable of supporting the Court's judgment in that case." *Grutter v. Bollinger*, 288 F.3d 732, 741 n.6 (6th Cir. 2002) (en banc), *aff'd*, 539 U.S. 306 (2003).

The majority today concludes that "the narrowest line of reasoning" supporting the *June Medical Services* decision is the entirety of Chief Justice Roberts' concurring opinion, including all dicta.[3] This is wrong, and stands in clear violation of the principle of *stare decisis* and the

---

[2]It is worth noting that the majority's analysis in this regard is not only incorrect, but is also apparently unnecessary to its preordained result. The majority (wrongly) concludes that Plaintiffs have not shown that Kentucky's transfer and transport agreement requirement would cause them to be unable to provide abortions. If this was true, the requirement would not impose either a burden or an obstacle, and therefore would equally fail under the *Whole Woman's Health* balancing test.

Moreover, beyond a brief Rule 28(j) letter, neither party has had the opportunity to present arguments as to what standard is appropriate for this Court to employ post-*June Medical Services*. This makes it especially unwise for this Court to forge this new ground.

[3]Although not necessary to a resolution of this case because the parts of Chief Justice Roberts' concurrence relied on by the majority are dicta, I also dispute whether the Chief Justice's concurrence is the narrowest opinion in

Supreme Court's admonitions that lower courts should not conclude that it has implicitly overruled its prior precedent. Chief Justice Roberts' concurring opinion does not free this Court from its duty to apply the binding precedent of *Whole Woman's Health*. Indeed, Chief Justice Roberts emphasized from the start that he was *not* considering the validity of *Whole Woman's Health*; the question before the Court, he said, "[was] not whether *Whole Woman's Health* was right or wrong, but whether to adhere to it in deciding the present case." 140 S. Ct. at 2133 (Roberts, C.J., concurring). He answered that question in the affirmative. *Id.* at 2133–34. The basis for his concurrence, then—as he clearly and repeatedly stated—was his respect for the decision in *Whole Woman's Health* under the principle of *stare decisis*. *Id.* "The legal doctrine of *stare decisis* requires us . . . to treat like cases alike." *Id.* at 2134. "This principle," he emphasized, "is grounded in a basic humility that recognizes today's legal issues are often not so different from the questions of yesterday and that we are not the first ones to try to answer them." *Id.*

To be sure, Chief Justice Roberts' concurrence in *June Medical Services* critiques *Whole Woman's Health*.[4] But that critique is dicta, as it was not necessary to his vote to concur. *See Wright v. Spaulding*, 939 F.3d 695, 701 (6th Cir. 2019). The narrowest reasoning supporting the judgment in *June Medical Services* is therefore simply and only that *Whole Woman's Health* and *stare decisis* required the Court to hold that Louisiana's law requiring abortion providers to obtain admitting privileges was as unconstitutional as Texas', where the district court did not

---

*June Medical Services.* The majority opinion is based on the premise that Chief Justice Roberts' concurrence is a "logical subset" of the plurality opinion. *United States v. Kratt*, 579 F.3d 558, 562 (6th Cir. 2009) (quoting *King v. Palmer*, 950 F.2d 771, 781 (D.C. Cir. 1991) (en banc)). However, we have also held that the "'narrowest' opinion refers to the one which relies on the 'least' doctrinally 'far-reaching-common ground' among the Justices in the majority: it is the concurring opinion that offers the least change to the law." *United States v. Cundiff*, 555 F.3d 200, 209 (6th Cir. 2009) (quoting *Johnson v. Bd. of Regents of the Univ. of Ga.*, 263 F.3d 1234, 1247 (11th Cir. 2001); *United States v. Johnson*, 467 F.3d 56, 63 (1st Cir. 2006)). The plurality opinion merely applied the law from *Whole Woman's Health* while Chief Justice Roberts' concurrence, according to the majority, limited *Whole Woman's Health*. Therefore, under this conception of the *Marks* test, the plurality offers the least change in the law and is controlling.

[4]To the extent that the Chief Justice concluded that *Whole Woman's Health* itself did not require a balancing test, his conclusion is contradicted by the clear language of that case, *Whole Woman's Health*, 136 S. Ct. at 2309, as well as by his fellow justices in *June Medical Services*, 140 S. Ct. at 2154 (Alito, J., dissenting) (stating that "the plurality adheres to the balancing test adopted in *Whole Woman's Health*"); *id.* at 2181 (Gorsuch, J., dissenting) ("At no point [in *Whole Woman's Health*] did the Court hold that the burdens imposed by the Texas law alone—divorced from any consideration of the law's benefits—could suffice to establish a substantial obstacle.").

clearly err in finding that the law imposed equivalent burdens. There is no basis in this Court or the Supreme Court's precedent for treating a single Justice's commentary on a prior decision in dicta as an overruling of an opinion duly issued by a majority of the Supreme Court.

The majority, however, asserts that, under *Marks*, dicta and holding cannot be separated and "the narrowest concurring opinion" in its entirety "is the Court's opinion." *Ante* at 20 (quoting *J.L. Spoons, Inc. v. Dragani*, 538 F.3d 379, 386 n.2 (6th Cir. 2008)). In its haste to eviscerate the constitutional right to an abortion, the majority adopts an understanding of the *Marks* rule that would lead to absurd results. In a Supreme Court case with a 4–4 split, no precedent would be safe from the tiebreaking Justice deciding to seize the opportunity to rewrite the law even if the other eight Justices disagreed. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1403 (2020) (plurality opinion).

For example, suppose the Supreme Court heard a case raising the issue of whether the Third Amendment's protection against quartering of soldiers is incorporated against the states. *See McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 765 n.13 (2010) (explaining that the Third Amendment has not yet been incorporated against the states). In this hypothetical case, four Justices agree that the Third Amendment is incorporated by the Due Process Clause of the Fourteenth Amendment and conclude that the petitioner is entitled to relief. *Cf. Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019). Another four Justices agree that the Due Process Clause is the proper vehicle for incorporation but believe that the Third Amendment should not be incorporated. *Cf. Apodaca v. Oregon*, 406 U.S. 404, 410 (plurality opinion). The tiebreaking Justice authors an opinion stating that: (1) the Due Process Clause is the wrong vehicle for incorporating fundamental rights against the states; (2) the Privileges or Immunities Clause is the appropriate vehicle for incorporation, *cf. Timbs*, 139 S. Ct. at 691 (Thomas, J., concurring); (3) the Privileges or Immunities Clause includes a "dual-track" incorporation approach under which provisions of the Bill of Rights can provide less protection when invoked against a state government than when invoked against the federal government; and (4) the Third Amendment is incorporated against the states and, based on the specific circumstances of her Third Amendment claim, the petitioner is entitled to relief, *cf. Johnson v. Louisiana*, 406 U.S. 366, 375 (1972) (Powell, J., concurring).

In this hypothetical, the tiebreaking Justice's opinion is most likely the narrowest; a dual-track theory of incorporation would accept fewer Third Amendment challenges to state action than a regime where rights apply with equal force against federal and state governments.[5]  *See Marks*, 430 U.S. at 193–94 (explaining that Justice Brennan's opinion, which provided the least First Amendment protections, was the narrowest); *see also ante* at 15.  The result, according to the majority's reasoning, is that decades of precedent dictating that fundamental rights are incorporated against the states via the Due Process Clause and rejecting the idea of dual-track incorporation would be overturned.  *See Ramos*, 140 S. Ct. at 1397 (citing *Duncan v. Louisiana*, 391 U.S. 145, 148–150 (1968); *Malloy v. Hogan*, 378 U.S. 1, 10–11 (1964)).

Fortunately, the *Marks* rule does not beget such absurd results for the simple reason that it is only the holding from the narrowest opinion, and only the narrowest reasoning supporting that holding, that is controlling—*i.e.*, that the Third Amendment is incorporated and provides protection in the specific circumstances addressed.  Thus, in *United States v. Santos*, a case about the definition of the term "proceeds" in the federal money laundering statute, Justice Scalia, writing for a four Justice plurality, explained that because Justice Stevens' "opinion rests upon the narrower ground, the Court's holding is limited accordingly."  553 U.S. 507, 523 (2008) (citing *Marks*, 430 U.S. at 193).  Justice Scalia, however, also explained that the controlling effect of Justice Stevens' opinion was *limited* to the "narrowness of his ground."  *Id.*  The "speculations" in the remainder of Justice Stevens' concurrence, according to Justice Scalia, "are the purest of dicta, and form no part of today's holding."[6]  *Id.*  According to the position taken by the majority, however, had Justice Stevens' speculations included his then-recently announced belief that the death penalty was unconstitutional, *see Baze v. Rees*, 553 U.S. 35, 86 (2008) (Stevens, J., concurring), his position on the death penalty would have been "entitled to as much

---

[5]To be sure, in this hypothetical, the plurality can be considered the "narrowest opinion" because, arguably, "it is the concurring opinion that offers the least change to the law" as it does not topple decades of precedent. *Cundiff*, 555 F.3d at 209.  But under this conception of "narrowest opinion," Chief Justice Roberts' concurrence in *June Medical Services* cannot be considered the narrowest opinion because the plurality leaves in place the precedent set by *Whole Woman's Health*.

[6]Significantly, while Justice Stevens disagreed with Justice Scalia's interpretation of his concurrence, he did not assert, as the majority claims, that his opinion, dicta and all, was the Court's opinion. *See id.* at 528 n.7

authority and respect as any other opinion of the Supreme Court," *ante* at 20. This, clearly, is an incorrect understanding of the *Marks* rule.

Moreover, the majority's reliance on our decision in *Grutter v. Bollinger* is misplaced. In *Grutter,* we held that Michigan Law School's admissions policy passed constitutional muster based on Justice Powell's discussion of the Harvard admissions plan in his concurring opinion in *Regents of the University of California v. Bakke*, 438 U.S. 265 (1978). *See Grutter*, 288 F.3d at 745–46. Because we held that it was appropriate to rely on Justice Powell's endorsement of the Harvard plan, "[e]ven if this portion of Justice Powell's opinion could be labeled dicta," the majority argues that we are bound by dicta under the *Marks* rule. *Id.* at 746 n.9. However, the majority omits a key distinction: in *Grutter*, we held that "Justice Powell's endorsement of the Harvard plan carries considerable *persuasive* authority" because *Bakke* was the only Supreme Court case to have addressed the relevant issue. *Id.* (emphasis added). Thus, we explained that Justice Powell's opinion "provide[d] a more appropriate basis for our opinion than any test we might fashion." *Id.*

*Grutter*, therefore, merely stands for the unremarkable proposition that, in the absence of controlling Supreme Court precedent, we may decide to adopt persuasive dicta from a Justice's concurrence.[7] In *Whole Woman's Health*, however, a majority opinion of the Supreme Court provided the controlling test for determining whether a state law constitutes an undue burden on abortion access. Thus, unlike in *Grutter*, there is no occasion for us to rely on Chief Justice Roberts' dicta in his *June Medical Services* concurrence as persuasive authority.[8]

---

[7]Moreover, the Supreme Court declined to endorse our *Marks* determination in *Grutter* and instead held that "[w]e do not find it necessary to decide whether Justice Powell's opinion is binding under *Marks*. It does not seem 'useful to pursue the *Marks* inquiry to the utmost logical possibility when it has so obviously baffled and divided the lower courts that have considered it.'" *Grutter v. Bollinger*, 539 U.S. 306, 325 (2003) (quoting *Nichols v. United States*, 511 U.S. 738, 745–746 (1994)).

[8]The majority's reliance on *Marks'* holding that "[t]he view of the *Memoirs* plurality . . . constituted the holding of the Court and provided the governing standards" to support its position is also unavailing. *Marks*, 430 U.S. at 193 (citing *Memoirs v. Massachusetts*, 383 U.S. 413 (1966)). In *Memoirs*, the three Justice plurality set forth a test for determining whether obscenity was protected by the First Amendment. *See id.* at 418. The plurality then explained that the "judgment [of the lower court] must be reversed" because "the court misinterpreted" the test. *Id.* at 419–420. Therefore, the governing standard articulated by the plurality in *Memoirs* was part of the holding because it was "necessary to the judgment," *see Wright*, 939 F.3d at 701—the plurality only determined that the court below erred because its holding was "founded on an erroneous interpretation" of that standard. *Memoirs*,

In fact, just this term, a plurality of the Supreme Court—including one of the dissenting justices in *June Medical Services*—rejected the notion that a single justice could by him or herself overturn prior precedent. *Ramos*, 140 S. Ct. at 1402. That plurality cautioned against "embrac[ing] a new and dubious proposition: that a single Justice writing only for himself has the authority to bind this Court to propositions it has already rejected." *Id.* "This is not the rule," the Court explained, "and for good reason—it would do more to destabilize than honor precedent." *Id.*

Applying Chief Justice Roberts' opinion in such a manner is especially egregious, given that the Chief Justice himself disavowed the notion that he was making any decision as to the continued validity of *Whole Woman's Health*. *June Med. Servs.*, 140 S. Ct. at 2133 (Roberts, C.J., concurring); *see also Whole Woman's Health v. Paxton*, 972 F.3d 649, 652 (5th Cir. 2020) (per curiam) (holding that *June Medical Services* "has not disturbed the undue-burden test, and [*Whole Woman's Health*] remains binding law. . . ."). The majority's interpretation thus also flouts the Supreme Court's admonitions that lower courts should not interpret a Supreme Court opinion as implicitly overturning its prior precedent.[9] *See, e.g.*, *Agostini*, 521 U.S. at 237. This Court should not "readily . . . anticipate the overruling of [the Supreme Court's] prior holdings." *Romo v. Largen*, 723 F.3d 670, 675 (6th Cir. 2013). That is, "[i]n the words of Learned Hand, it is not 'desirable for a lower court to embrace the exhilarating opportunity of anticipating a doctrine which may be in the womb of time, but whose birth is distant.'"[10] *Id.* (quoting *Specter*

---

383 U.S. at 420. By contrast, in *June Medical Services*, Chief Justice Roberts "decide[d]" whether the Louisiana law at issue was unconstitutional based only on *stare decisis* and the factual similarities to *Whole Woman's Health*; thus, his personal opinion about the consistency between *Casey* and *Whole Woman's Health* was merely dicta and is not controlling under *Marks*. *Wright*, 939 F.3d at 701–02.

[9]Justice Kavanaugh's suggestion that "five Members of the Court reject[ed] the *Whole Woman's Health* cost-benefit standard" in *June Medical Services*, 140 S. Ct. at 2182 (Kavanaugh, J., dissenting), and indeed the dissenting opinions as a whole, do not matter in this analysis. As we have explained, "*Marks* instructs lower courts to . . . ignore dissents." *Bormuth v. County of Jackson*, 870 F.3d 494, 515 (6th Cir. 2017) (en banc) (quoting *Cundiff*, 555 F.3d at 208). And the Supreme Court itself has clarified that even "[t]he views of five Justices that [a] case should be reconsidered or overruled cannot be said to have effected a change" in its jurisprudence where the question of whether a case should be overruled "was not before [it]." *Agostini*, 521 U.S. at 217.

[10]The majority contends that the plurality opinion in *Casey*, which limited *Roe*, demonstrates that a controlling concurrence under *Marks* can reinterpret earlier Supreme Court precedent. However, in *Casey*, the three Justice plurality explicitly explained that they were reinterpreting *Roe* and that their holding was based on their reinterpretation of the undue burden standard. *See Casey*, 505 U.S. at 878–79 ("These principles control our assessment of the Pennsylvania statute . . ."). Treating the *Casey* plurality's reinterpretation of the undue burden

*Motor Serv. v. Walsh*, 139 F.2d 809, 823 (2d Cir. 1943) (Hand, J., dissenting), *vacated sub nom. Specter Motor Serv. v. McLaughlin*, 323 U.S. 101 (1944)).

Thus, absent an express holding overruling *Whole Woman's Health*, our obligation is to continue to apply its balancing test, and the majority wrongly concludes otherwise. However, with all this said, even if the Chief Justice's dicta criticizing *Whole Woman's Health* controls, a correct application of the test he enunciated also demonstrates that this Court should affirm. Thus, I will apply both tests, starting with the binding *Whole Woman's Health* standard.

## II.

*Whole Woman's Health* requires this Court to determine whether an abortion restriction constitutes an undue burden by "consider[ing] the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309; *accord June Med. Servs.*, 140 S. Ct. at 2120 (plurality opinion). I begin, then, with the burdens imposed by Kentucky's requirement, as identified by the district court.

### A. Burdens

The district court found that KRS § 216B.0435 and 902 KAR 20:360 § 10 "create[] an impediment to the availability of abortions by virtually assuring that abortion facilities will not operate in Kentucky." *EMW Women's Surgical Ctr. v. Glisson*, No. 17-189, 2018 WL 6444391, at \*19 (W.D. Ky. Sept. 28, 2018). Specifically, the court found that EMW and Planned Parenthood cannot enter into transfer or transport agreements that would satisfy Kentucky's requirement, and therefore would be unable to maintain licenses to perform abortions in the Commonwealth. *Id.* If EMW and Planned Parenthood are unable to perform abortions, the court further concluded, this would effectively eliminate abortion in Kentucky, thus unduly burdening

standard as controlling, therefore, is correct under *Marks*. In *June Medical Services*, however, Chief Justice Roberts' concurrence stated that he was *not* deciding "whether *Whole Woman's Health* was right or wrong" and, as explained above, his opinion about the holding of *Whole Woman's Health* was dictum. 140 S. Ct. at 2133. Moreover, unlike the opinion of the four Justice plurality in *June Medical Services*, in *Casey*, the two concurrences that combined with the plurality to form a majority of the Court recognized the plurality opinion as the opinion of the Court. *See Casey*, 505 U.S. at 912–13 (Stevens, J., concurring) ("I also accept what is implicit in the Court's analysis . . ."); *id.* at 922–23 (Blackmun, J., concurring) ("I do not underestimate the significance of today's joint opinion."). Therefore, *Casey* does not support the majority's conclusion that the dicta in the Chief Justice's concurrence in *June Medical Services* implicitly overruled *Whole Woman's Health*.

individuals' right to access an abortion. *Id.* Each of the district court's findings is well-supported by the judicial record. Thus, each is a permissible view of the evidence, and none is clearly erroneous. *Anderson*, 470 U.S. at 574. Those findings demonstrate that KRS § 216B.0435 and 902 KAR 20:360 § 10 impose weighty burdens on the right to abortion access—indeed, burdens far weightier than even those imposed by the laws at issue in *Whole Woman's Health* and *June Medical Services*. I address each finding in turn.

First, as the majority acknowledges, Defendants do not dispute that EMW and Planned Parenthood cannot enter into transfer or transport agreements that would satisfy KRS § 216B.0435 and 902 KAR 20:360 § 10. The record clearly supports this finding. EMW attempted to enter into transfer agreements with Louisville hospitals, but none agreed. Planned Parenthood made similar efforts, to no avail.

Though they effectively concede this point, Defendants contest the district court's resulting conclusion that EMW and Planned Parenthood will be unable to offer abortions in Kentucky without compliant transfer and transport agreements. They say that Plaintiffs have not shown that the lack of such agreements would prevent them from offering abortions because Plaintiffs could continually and indefinitely apply for ninety-day extensions of the time required to comply with Kentucky's transfer and transport agreement requirement, pursuant to 902 KAR 20:360 § 10(5).[11] According to Defendants, EMW and Planned Parenthood's failure to apply for an extension under this provision severs the chain of causation linking KRS § 216B.0435 and 902 KAR 20:360 § 10 with their inability to perform abortions in Kentucky.

Defendants' argument is farcical, at best. For starters, a good-faith effort does not require exhausting every possible avenue for relief. *See, e.g.*, *June Med. Servs.*, 140 S. Ct. at 2122–23 (plurality opinion) (explaining that "some providers could have chosen in good faith *not* to apply to every qualifying hospital for admitting privileges"). Nor does "[g]ood faith . . . require an exercise in futility." *Id.* at 2128; *accord Safeco Ins. Co. of Am. v. City of White House*, 36 F.3d 540, 548 (6th Cir. 1994). A ninety-day extension from the Inspector General has never in fact

---

[11]It is worth noting at the outset that Defendants' argument in this regard is inconsistent with their contentions regarding the benefits of KRS § 216B.0435 and 902 KAR 20:360 § 10—namely, that transfer and transport agreements are necessary in order to "optimize[] patient safety." (*See* Defs.' Br. at 32.)

been an available avenue for relief in this case. The extension provision Defendants point to was added to 902 KAR 20:360 § 10 in June 2017, three months after the initiation of this case. And by that time, the district court had already enjoined the enforcement of both KRS § 216B.0435 and 902 KAR 20:360 § 10. Accordingly, the extension provision has never taken effect, and it has at all times been impossible for the Inspector General to grant EMW, Planned Parenthood, or any abortion facility a ninety-day extension pursuant to 902 KAR 20:360 § 10(5). Thus, Defendants' causation argument is unpersuasive.

But setting that aside, the district court appropriately rejected Defendants' extension argument for an altogether different reason. It concluded that even if EMW and Planned Parenthood *could* secure an extension for some period of time, "the uncertainty of a discretionary waiver would make it exceedingly difficult for an abortion facility to survive" because it would "not likely be able to hire and keep staff without knowing whether [it] could continue operating beyond ninety days" and because it would not be able to secure necessary investments as "no prudent organization would risk millions of dollars investing in such a facility whose temporary license would be based on the administrative whim of the Inspector General." *EMW v. Glisson*, 2018 WL 6444391, at *19. This finding was not clearly erroneous, as the evidence plausibly suggests that EMW and Planned Parenthood would be forced to stop providing abortions if they were compelled to operate on the basis of ninety-day extensions.

First, the owner of EMW, Dr. Marshall, testified that it would be impossible for EMW to continue to operate on ninety-day extensions because there would be "no security" in such a situation. (Trial Tr., R. 112 at PageID #4121.) He explained that EMW "wouldn't be able to hire any staff" without being able to offer more prolonged job security. (*Id.*) Altogether, he said, "the ramifications" of such a situation would be burdensome. (*Id.* at #4122.) Likewise, Kimberly Greene, the Chair of Planned Parenthood's Board of Directors, added that it would also be "very difficult" for Planned Parenthood to operate on indefinite ninety-day extensions, noting that it could not have raised adequate funds for its current facility without a more prolonged guarantee of operation. (Trial Tr., R. 116 at PageID #4321.) She further explained that it would not even be "responsible of us as a board to even try to [raise money]" if Planned Parenthood could only operate on ninety-day extensions. (*Id.* at #4304.)

Casting aside this evidence, the majority concludes that the district court's finding was clearly erroneous. It does so only by distorting the mandatory clear error standard of review and subjecting the evidence to something more stringent than even *de novo* review. The majority stretches the district court's words, denies the court's ability to make even the most reasonable of inferences, distorts witness testimony, and altogether rejects the preponderance of the evidence standard. The law is clear that this Court may not overturn a district court's plausible interpretation of the evidence, even if it is "convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 574. Today, the majority nonetheless "take[s] it upon [itself] to weigh the trial evidence as if [it] were the first to hear it," thus vastly overstepping the bounds of this Court's role. *Cooper v. Harris*, 137 S. Ct. 1455, 1478 (2017).

Despite the ample evidence presented by Plaintiffs and credited by the district court, the majority points to no contrary evidence suggesting that Plaintiffs could indeed continue to operate on continuous, indefinite ninety-day extensions. They cannot, because Defendants have apparently presented none and thus cannot claim that the preponderance of the evidence did not support Plaintiffs' contention. Instead, all the majority can do to achieve its desired end is attempt to undermine the evidence presented by the Plaintiffs and relied upon by the district court. After scouring that evidence thoroughly, it comes up with only a few weak and legally unprecedented rationalizations for rejecting it. First, the majority suggests that Dr. Marshall's trial testimony was unreliable because it partially conflicted with his deposition testimony. But this analysis is a perfect example of the sort of review this Court is *not* permitted to undertake. As Judge Larsen herself has recognized, "'[our] function is not to decide factual issues *de novo*.' Instead, we owe great deference to the trial court's factual determinations, particularly when they rest on its assessment of the credibility of witnesses." *Slusher v. U.S. Postal Serv.*, 731 F. App'x 478, 481 (6th Cir. 2018) (quoting *Anderson*, 470 U.S. at 573); *accord Cooper*, 137 S. Ct. at 1474 (explaining that appellate courts must "give singular deference to a trial court's judgments about the credibility of witnesses").

The majority next places unjustifiable weight on Dr. Marshall's use of the word "whim" in order to conclude that his testimony "establishes only that EMW would be unable to retain

staff if the Inspector General's decision on whether to grant a waiver were arbitrary." *Ante* at 31. This blatantly and impermissibly reinterprets Dr. Marshall's testimony as if the majority were "the first to hear it." *Cooper*, 137 S. Ct. at 1478. Dr. Marshall explained:

> Well, I think the problem [with relying on the extension provision] is that your license is at stake every 90 days, so you're at the whim of being closed every 90 days. There's no security that you can even—you can't offer a person a job and say, "Well, I have you a job for 90 days, but I don't know if I'm going to have you a job past that." We wouldn't be able to hire any staff.

(Trial Tr., R. 112 at PageID #4121.) Read reasonably, Dr. Marshall's testimony suggests simply that an abortion facility would be unable to hire and retain staff when the facility's continued existence is in question every ninety days—no matter whose determinations that existence depends upon or how that person may undertake that decision. Indeed, Dr. Marshall never once references the Inspector General. Nor does he suggest that the Inspector General's decision would be arbitrary. The issue with relying on the extension provision is, simply and fundamentally, that it causes insecurity.

The majority also resorts to implicitly treating Justice Alito's *dissenting* opinion in *June Medical Services*, rejected by both the plurality and the Chief Justice, as binding. According to the majority, "Dr. Marshall's subjective belief," based on his decades of experience in the field, that EMW's physicians and staff would resign and that he would be unable to hire replacements, was an insufficient basis for the district court to conclude that a good faith attempt to operate based on applying for a waiver every ninety day would be futile. *Ante* at 32. The majority provides a list of questions that, had it been the triers of fact, it would have asked Dr. Marshall, and states that we cannot determine whether Dr. Marshall's subjective belief was reasonable because "[w]e have no way of knowing the answers to these questions from Dr. Marshall's testimony." *Ante* at 32 & n.18.

In *June Medical Services*, the Supreme Court reviewed the Fifth Circuit's holding that the district court's finding that the challenged Louisiana law would cause an undue burden was "clearly erroneous" because "there was clear evidence in the record before the district court that various doctors failed to seek admitting privileges in good faith." *June Med. Servs. L.L.C. v. Gee*, 905 F.3d 787, 811 (5th Cir. 2018). The Supreme Court reversed. According to the

plurality, which the majority concedes was endorsed by Chief Justice Roberts,[12] "[t]he problem" with the Fifth Circuit's approach was "that the law requires appellate courts to review a trial court's findings under the deferential clear-error standard." *June Medical Servs.*, 140 S. Ct. at 2124 (plurality opinion). It is worth reiterating for the majority's benefit that, under this standard, "a district court's findings of fact, 'whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.'" *Id.* at 2121 (citing Fed. R. Civ. P. 52(a)(6)); *see also Whole Woman's Health*, 136 S. Ct. at 2313 (explaining that a district court is entitled to credit "direct testimony as well as plausible inferences to be drawn" from the record). Therefore, "[a] finding that is 'plausible' in light of the full record—even if another is equally or more so—must govern." *Id.* (citing *Cooper*, 137 S. Ct. at 1465).

The discussion in *June Medical Services* concerning whether Doe 5 acted in good faith demonstrates the majority's blatant disregard of our role in reviewing the district court's finding. "The challenged law would have [had] no effect on [Doe 5] if he could [have found] a covering doctor in Baton Rouge, but he asked only one doctor. He did little to pursue applications at two other hospitals because he was not optimistic about his chances and those hospitals required a certain amount of unpaid service to the poor." *Id.* at 2164 (Alito, J., dissenting). Unlike Dr. Marshall, Doe 5 did not testify at trial. Nonetheless, based only on a declaration and a transcript of a deposition, the district court held that he acted in good faith. Because Doe 5 "asked the doctor most likely to respond affirmatively," the plurality concluded that "[w]ith his own experience and their existing relationship in mind, Doe 5 could have reasonably thought that, if this doctor wouldn't serve as his covering physician, no one would. And it was well within the District Court's discretion to credit that reading of the record." *Id.* at 2126. In other words, contrary to the majority's position, Dr. Marshall's reasonable subjective belief, based on his extensive experience, that EMW would be unable to operate on the basis of quarterly waivers is

---

[12]The Chief Justice explained that the district court had to determine that the physicians attempted in good faith, as opposed to making a "halfhearted attempt," to comply with the challenged law and obtain admitting privileges. *June Med. Servs.*, 140 S. Ct. at 2141 (Roberts, C.J., concurring). The majority concedes that Chief Justice Roberts "endors[ed] the plurality's discussion of the physicians' efforts to obtain admitting privileges," *ante* at 31–32, because he concluded that "the District Court's [determination that the physicians acted in good faith] reveals no . . . clear error, for the reasons the plurality explains," *June Med. Servs.*, 140 S. Ct. at 2141 (Roberts, C.J., concurring).

enough to support the district court's finding that operating under the waiver system was not feasible.[13]

The majority, however, prefers to adhere to Justice Alito's dissenting opinion. In dissent, Justice Alito stated that "the factual finding on which the plurality and [the Chief Justice] rely— that the Louisiana law would drastically reduce access to abortion in the State—depends on the District Court's finding that the doctors in question exercised 'good faith' in their quest for privileges, but that test is woefully deficient." *June Medical Servs.*, 140 S. Ct. at 2159 (Alito, J., dissenting). According to Justice Alito, "the District Court's 'good faith' test was not up to the task," because "'good faith' might easily mean only that a doctor lacked the subjective intent to avoid getting privileges." *Id.* at 2159–160 (Alito, J., dissenting) (citing Black's Law Dictionary 836 (11th ed. 2019)). Likewise, Justice Alito's dissent "maintain[ed] that the plaintiffs could have introduced still more evidence to support the District Court's determination." *June Medical Servs.*, 140 S. Ct. at 2128 (plurality opinion). But this view was also rejected by the plurality because "[w]e have no license to reverse a trial court's factual findings based on speculative inferences from facts not in evidence." *Id.* at 2125, 2128 (plurality opinion).

Although the majority apparently believes that Justice Alito had the better of the argument in *June Medical Services,* its desired end of restricting access to abortion does not allow it to adopt his dissent as binding. The district court accepted Dr. Marshall as an expert in

---

[13]The majority believes that the brevity of Dr. Marshall's testimony renders it insufficient to support the district court's finding when compared to the "many pages" devoted by the *June Medical Services* plurality to the issue of whether the doctors in that case had made a good faith effort to obtain hospital admitting privileges. *Ante* at 39. But the majority ignores the differences between the two cases. The plurality had to examine the different hospital policies and the individual circumstances of the doctors in *June Medical Services* to ascertain whether each of the doctors tried in good faith to obtain admitting privileges—*i.e.*, that Doe 5 needed to find a covering doctor in the Baton Rouge area and that he asked the doctor most likely to serve as his covering doctor. We are faced with a different inquiry. The question before us is whether Dr. Marshall's subjective belief was reasonable that operating on the uncertainty of quarterly waivers would be futile because he would be unable to hire staff. The district court credited Dr. Marshall's testimony, and the record evidence provides support for the district court's finding that the "uncertainty of a discretionary waiver would make it exceedingly difficult for an abortion facility to survive." *EMW v. Glisson*, 2018 WL 6444391, at *19. Put simply, unlike the determination of whether it was reasonable for a doctor to determine that taking certain action in pursuit of admitting privileges was futile—which requires a fact intensive inquiry—common sense suggests that, faced with the uncertainty inherent with operating under quarterly waivers, it would be extremely difficult to hire and retain staff. As "[c]ourts are free to base their findings on commonsense inferences drawn from the evidence," we have no right to require more. *Whole Woman's Health*, 136 S. Ct. at 2137. The majority speculates that some physicians might have been willing to continue working at EMW (although, presumably, they would eventually retire) but "[w]e have no license to reverse a trial court's factual findings based on speculative inferences from facts not in evidence." *June Medical Servs.*, 140 S. Ct. at 2125 (plurality opinion).

abortion care and, based on his extensive experience performing abortions in Louisville, credited his reasonable testimony that relying on obtaining a waiver every ninety days to remain in operation was not feasible.  Based on the majority's refusal to accept the reasonable belief of the highly experienced Dr. Marshall, and its inexplicable demand "for still more evidence to support the District Court's determination," it can only be assumed that the majority is relying on Justice Alito's dissenting opinion.  *June Medical Servs.*, 140 S. Ct. at 2128 (plurality opinion).  The law, as stated in the controlling opinion, however, makes it clear that the district court was entitled to make the plausible finding that hiring staff would be exceedingly difficult without any long-term security, and the majority wholly exceeds our role in so questioning the district court's discretion.  The majority's form of scrutiny is simply and obviously not clear error review.

The majority next discards Greene's testimony, saying that the district court could not rely upon it because Greene spoke only to whether Planned Parenthood would have been able to raise money to build its Louisville facility, which Planned Parenthood acknowledges it has already built, if it had been relying on ninety-day extensions.  But this wrongly limits the district court's factfinding capacity by denying it permission to make reasonable inferences.  "Courts are free to base their findings on commonsense inferences drawn from the evidence."  *Whole Woman's Health*, 136 S. Ct. at 2317; *see also id.* at 2313 (stating that causation can be shown through "direct testimony as well as plausible inferences" drawn from the evidence).  The court could appropriately and rightly infer that if Planned Parenthood would not have been able to raise money to build a facility while operating on ninety-day extensions, it also would not be able to raise funds for other necessary resources or operations in the future.

The majority denies the district court's right to make reasonable inferences not only in this regard, but also by unnecessarily and inappropriately segregating the evidence offered by EMW and Planned Parenthood.  For instance, it notes that "Greene never testified that Planned Parenthood would be unable to hire or retain staff if it had to rely on" extensions.  *Ante* at 29–30.  But simple common sense suggests that if one abortion facility would be unable to hire on such a basis, another would face the same challenge.  Likewise, simple common sense suggests that if one abortion facility would be unable to raise necessary funds in such a situation, so too would another.

Really, the majority denies the district court the right to exercise its common sense at all. Even if Plaintiffs had put forth *no* evidence pertaining to the extension provision's effect on hiring or fundraising, a rational person would recognize that such an insecure situation would place a business's future in jeopardy. I have no doubt that my colleagues would not be so eager to accept a job that might disappear ninety days later. I also doubt whether either would invest in a business that might shutter in that period. They ignore basic reason only because it is necessary to reach their desired end—upholding a law restricting abortion.

The majority further rejects the district court's conclusion based on this evidence—that "the uncertainty of a discretionary waiver would make it exceedingly difficult for an abortion facility to survive"—only by homing in on and rigidly interpreting select portions of the court's findings. *EMW v. Glisson*, 2018 WL 6444391, at \*19. It centers the district court's subsequent statement that it would be imprudent for an organization to invest in a facility "whose temporary license would be based on the administrative whim of the Inspector General." *Id.* "[D]iscretion is not whim," says the majority, and it goes on to state its view of the factors the Inspector General must consider and the presumption that public officials act in good faith. *Ante* at 28 (quoting *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005)). Of course, this again places undue weight on the district court's use of the word "whim" and altogether ignores the actual import of the district court's finding—that abortion providers cannot continue to operate in a constant state of uncertainty about their future.

In any event, the majority's speculation about whether the Inspector General will indeed act arbitrarily is simply irrelevant, and it fails to justify its desired outcome. It may be true that the Inspector General will act in good faith in deciding whether to grant EMW and Planned Parenthood extensions, although the record suggests that previous Inspectors General have not demonstrated such good faith in their treatment of abortion facilities.[14] It may even be true that

---

[14]In fact, the district court had every reason to conclude that the Inspector General would not act in good faith. For one, CHFS started subjecting Planned Parenthood and EMW to heightened scrutiny and stringent agreement requirements long before regulations justifying such scrutiny were enacted. *EMW v. Glisson*, 2018 WL 6444391, at \*17 ("Despite [Inspector General] Silverthorn's criticism [of EMW's agreement with Louisville Hospital in March 2017], it does not appear that these points violated either the statute or regulation in existence at the time."). Moreover, the record suggests that CHFS itself told Planned Parenthood that it was required to begin performing abortions before it was licensed in order to secure that license only to reverse course and sue Planned Parenthood simply because it followed CHFS's instruction.

this Court must presume that the Inspector General will act in good faith.[15]  Regardless, the Inspector General's good faith in granting extensions does not mean that EMW or Planned Parenthood can depend upon receiving such extensions consistently and indefinitely and does nothing to eliminate the state of uncertainty that makes it impossible for facilities to continue to operate.

The majority cites the Eighth Circuit's decision in *Comprehensive Health of Planned Parenthood Great Plains v. Hawley*, 903 F.3d 750 (8th Cir. 2018), in an attempt to justify its deficient reasoning.  In that case, the court held that the plaintiffs' constitutional challenge to a Missouri law imposing certain design requirements on abortion facilities was "not currently fit for judicial resolution" because the court "lack[ed] sufficient information" on how Missouri would implement a provision under which it could waive those requirements for select facilities. *Id.* at 757.  However, not only is that decision not binding upon this Court; it is also inapposite. For starters, the relevant provision there was one through which requirements could be altogether *waived* for facilities, not simply postponed.  A waiver may allow an abortion facility certainty in its continued operation in a manner that Kentucky's extension provision does not.  If indeed EMW and Planned Parenthood could secure a wholesale waiver of Kentucky's transfer and transport requirement—rather than mere ninety-day extensions—this would be a different case entirely.  Moreover, in *Hawley*, Missouri had already agreed to waive the relevant requirements for two abortion facilities, *id.* at 756, lending weight to the idea that waivers would be granted and, if they were, abortion facilities could continue to operate under them.  Finally, and most critically, the court's decision in *Hawley* depended upon the fact that "withholding constitutional judgment" would not impose any hardship because "[n]o facilities currently providing abortions would be closed because of" the law's requirements. *Id.* at 757.  In this case, the evidence suggests that not only will Kentucky abortion facilities be closed as a result of the majority's decision today—*all* of those facilities will be closed.

---

[15]Again, though, this analysis is questionable.  The majority cites *Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456 (6th Cir. 1999) for the proposition that "we must presume that the Inspector General . . . will not act 'simply to make it more difficult for [women] to obtain an abortion." *Ante* at 29 (quoting *Memphis Planned Parenthood*, 175 F.3d at 461).  Nothing in *Memphis Planned Parenthood*, however, establishes such a presumption.  The full clause quoted by the majority states only "that a state may not erect procedural hurdles in the path of a woman seeking an abortion simply to make it more difficult for her to obtain an abortion." *Memphis Planned Parenthood*, 175 F.3d at 461.

Thus, then, I turn to the district court's next finding—that if EMW and Planned Parenthood cannot perform abortions, this will effectively eliminate access to abortion in Kentucky. The majority does not contest this point because it is uncontestable based on the evidence.[16] EMW performs an average of 3,000 abortions per year, which has historically accounted for over 99% of abortions performed in the Commonwealth. The remaining fraction of a percent was performed by some combination of hospitals, ambulatory surgical centers ("ASCs"), and physicians' offices. Even assuming that Planned Parenthood provides some significant percentage of abortions performed in Kentucky now, whatever portion it performs will also be eliminated upon its close. And there is no evidence to suggest that hospitals, ASCs, and physicians' offices provide any greater percentage of abortions now than they have historically. Thus, the district court's finding is a permissible view of the evidence, and is not clearly erroneous.

Defendants nonetheless argue that EMW and Planned Parenthood's inability to perform abortions will not effectively eliminate abortion in Kentucky because hospitals, ASCs, and physicians' offices could meet the entirety of the demand for abortions. Clear Supreme Court precedent counters this argument. As the Supreme Court held in *Whole Woman's Health*, "common sense suggests that, more often than not, a physical facility that satisfies a certain physical demand will not be able to meet five times that demand without expanding or otherwise incurring significant costs." 136 S. Ct. at 2317; *accord June Med. Servs.*, 140 S. Ct. at 2140 (Roberts, C.J., concurring) (affirming district court finding that reducing the number of clinics in Louisiana from three to two or one would "[e]ven in the best case" cause "the demand for services [to] vastly exceed the supply" (quoting *June Med. Servs. v. Kliebert*, 250 F. Supp. 3d 27, 87 (M.D. La. 2017))). In this case, in which hospitals, ASCs, and physicians' offices would have to be able to meet more than one hundred times their current demand, common sense does much more than suggest that conclusion; it compels it. Moreover, the Court in *Whole Woman's Health* also held that "[h]ealthcare facilities and medical professionals are not fungible commodities."

---

[16]The majority does, however, suggest that Plaintiffs must show that "*both*" EMW and Planned Parenthood would close in order to show that Kentucky's requirement unduly burdens the right to access abortion. *Ante* at 29, 34. This is simply and obviously wrong. Even the closure of just one of the only two facilities could unduly burden the right to an abortion if the remaining facility was left unable to meet the demand for abortions. *See Whole Woman's Health*, 136 S. Ct. at 2317–18; *June Med. Servs.*, 140 S. Ct. at 2140 (Roberts, C.J., concurring).

136 S. Ct. at 2318. Accordingly, even if hospitals, ASCs, and physicians' offices could somehow meet that demand, in "attempting to accommodate [such] sudden, vastly increased demand," they would likely "find that quality of care declines." *Id.*

Defendants also argue that the inability of EMW and Planned Parenthood to perform abortions will not effectively eliminate abortion in the Commonwealth because both providers could open new abortion facilities in Lexington, Kentucky, where they were previously able to enter into transfer agreements with the University of Kentucky Hospital. But this argument is also unpersuasive. EMW's Dr. Marshall testified that opening a new facility in Lexington would be "impossible" in part because EMW would have to "buy a new building, equip it, [and] find new staff." (Trial Tr., R. 112 at PageID #4090.) Similarly, Kimberly Greene of Planned Parenthood testified that opening a new facility in Lexington would not be possible in part because Planned Parenthood would have to "raise another [$3 or] $4 million" to fund it. (Trial Tr., R. 116 at PageID #4315.) Additionally, Dr. Marshall also testified that CHFS in fact rejected several versions of EMW's transfer agreement with the University of Kentucky Hospital, explaining that "every time [EMW] complied with what [CHFS] requested, then [CHFS] changed their request." (Trial Tr., R. 112 at PageID #4113.) In any event, even if EMW and Planned Parenthood could feasibly relocate to Lexington, Defendants' argument that they must do so finds no support in Supreme Court precedent. In neither *June Medical Services* nor *Whole Woman's Health* did the Court ever consider the possibility that abortion facilities could move to cities in which their physicians were able to obtain admitting privileges, let alone hold that they were required to do so. *See June Med. Servs.*, 140 S. Ct. at 2122–28 (plurality opinion); *id.* at 2139–41 (Roberts, C.J., concurring); *Whole Woman's Health*, 136 S. Ct. at 2312–14.

Finally, then, I must consider the district court's ultimate conclusion—that the effective elimination of abortion in Kentucky will place a substantial obstacle in the path of Kentucky women's right to abortion access. EMW and Planned Parenthood are the only remaining abortion facilities in Kentucky. In *June Medical Services*, the Supreme Court held that the closure of one- or two-thirds of Louisiana's abortion clinics unduly burdened individuals' right to access abortions, 140 S. Ct. at 2115, 2132 (plurality opinion); *id.* at 2134 (Roberts, C.J., concurring); in *Whole Woman's Health*, it held the same regarding the closure of half of Texas'

abortion facilities, 136 S. Ct. at 2313. It necessarily follows, both as a matter of legal reasoning and as a matter of common sense, that the closure of Kentucky's only remaining abortion facilities would do so as well. The closures would lead to the same consequences in each scenario, such as "fewer doctors, longer waiting times, . . . increased crowding . . . [and] increased driving distances." *Id.*; *see also June Med. Servs.*, 140 S. Ct. at 2129–30 (plurality opinion); *id.* at 2140 (Roberts, C.J., concurring). The district court found that each of those consequences would follow from the closure of EMW, with the addition that all women seeking abortions would be forced to travel to another state.

Defendants attempt to refute even this obvious conclusion by arguing that the wholesale closure of Kentucky's abortion providers would not unduly burden abortion access because individuals can simply travel to another state to receive an abortion. This argument is particularly unpersuasive, and was recently unequivocally rejected in another case in which the Commonwealth presented it:

> As the Supreme Court [has] explained . . . obligations are "imposed by the Constitution upon the States severally as governmental entities—each responsible for its own laws establishing the rights and duties of persons within its borders." States may not shift the burden of their constitutional obligations to other states, "and no State can be excused from performance by what another State may do or fail to do."

*EMW v. Friedlander*, 960 F.3d at 811 (quoting *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350 (1938)). It is as meritless in this case as it was there.

## B. Benefits

I turn then to the district court's findings as to the benefits of Kentucky's transfer and transport agreement requirement. It is true that Kentucky has "a legitimate interest in seeing to it that abortion, like any other medical procedure, is performed under circumstances that [e]nsure maximum safety for the patient." *Roe*, 410 U.S. at 150. However, it does not follow that every law or regulation Kentucky may pass in the name of that interest necessarily benefits it. The district court found that "neither KRS [§] 216B.0435 nor 902 KAR 20:360 Section 10 advances Kentucky's interest in protecting women's health and safety." *EMW v. Glisson*, 2018 WL 6444391, at *24. A review of the evidence confirms that this finding is not clearly erroneous.

Indeed, the district court relied on evidence nearly identical to that relied upon by the plurality in *June Medical Services* and the majority in *Whole Woman's Health* in upholding identical findings: that the laws at issue did not advance states' legitimate interest in protecting patient health. *June Med. Servs.*, 140 S. Ct. at 2130–32 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2311, 2315–16.

Before delving into the record, I must address the majority's criticism of the district court's factfinding with regard to this point. My colleagues say that the district court's weighing of the benefits "does not comport with the 'traditional rule that state and federal legislatures [have] wide discretion to pass legislation in areas where there is medical and scientific uncertainty.'" *Ante* at 23 (alteration in original) (quotations omitted) (quoting *June Med. Servs.*, 140 S. Ct. at 2136 (Roberts, C.J., concurring)). Again, they wrongly rely upon Chief Justice Roberts' concurring opinion in *June Medical Services*, rather than the Supreme Court's clear rejection of this idea in *Whole Woman's Health*: "The statement that legislatures, and not courts, must resolve questions of medical uncertainty is . . . inconsistent with this Court's case law." 136 S. Ct. at 2310. Thus, the district court properly independently assessed the evidence in considering the benefits of Kentucky's transfer and transport agreement requirement.

The findings that the district court made based on that evidence are not clearly erroneous. First, the record supports the district court's finding that the situations in which transfer and transport agreements might be employed—serious abortion complications that occur while a patient is at an abortion facility—are exceedingly rare. After hearing the evidence, the district court concluded that abortions are fundamentally a safe procedure. That conclusion found strong grounding in multiple studies cited by the court, as well as in testimony heard by the court. (*See* Ushma D. Upadhyay, et al., *Incidence of Emergency Department Visits and Complications After Abortion*, 125 Obstetrics & Gynecology 175, 175 (2015) [hereinafter "the Upadhyay Study"] (indicating that the major complication rate for abortions was 0.23%); Nat'l Acads. Of Scis., Eng'g & Med., *The Safety and Quality of Abortion Care in the United States* 55, 60 (2018) (concluding based on data from several studies that the complication rate for medication abortions was "no more than a fraction of a percent" and that aspiration abortions also "rarely

result in complications"); Trial Tr., R. 108 at PageID #3910 (Plaintiffs' expert testifies that "abortion is a very safe procedure," in which "complications are rare and rarely serious").)

The district court further concluded that abortion complications generally arise, if at all, "after the patient has returned home" from the abortion facility, "rendering meaningless any transfer or transport agreement between the abortion [facility] and another entity." *EMW v. Glisson*, 2018 WL 6444391, at *13. As before, this conclusion was well-grounded in medical studies and expert testimony. *See id.* (citing Trial Tr., R. 108 at PageID ##3893–94 (Plaintiffs' expert testifies that in the rare situations in which complications arise, they usually arise after the patient has returned home); Upadhyay Study at 175 (indicating that abortions require same-day transfer in 0.03% of cases)). Finally, the record also supports the district court's determination that complications that do arise at the abortion facility are often minor complications that can be treated at the facility itself. *See id.* at *12 (citing Trial Tr., R. 108 at PageID #3896 (Plaintiffs' expert testifies that abortion complications "typically can be managed in an outpatient facility, [such as] a physician's office or a clinic")).

Thus, the record amply justifies the district court's finding that the situations in which transfer and transport agreements might be employed arise only rarely. But even if that were not the case, the district court also did not err in finding that transfer and transport agreements do not improve patient care as compared to the care provided in the absence of such agreements. An abundance of evidence supports this point. For instance, then-Inspector General Robert Silverthorn testified at trial that he was not aware of even a single instance in which the absence of a transfer or transport agreement caused a woman harm or caused her to receive less than the standard of care due. Additionally, several witnesses explained that transfer and transport agreements do not increase the quality of care that patients receive as compared to the quality of care they receive in the absence of such agreements. Even the text of 902 KAR 20:360 § 10 recognizes that the quality of care provided with transfer and transport agreements can also be provided without them, requiring the Inspector General to consider whether the abortion facility "can provide the same level of patient care and safety via alternative health services during any extension period" before granting a waiver. 902 KAR 20:360 § 10(5)(b).

This conclusion is further supported by recent updates to Centers for Medicare and Medicaid ("CMS") regulations, which remove a requirement that ambulatory surgical centers participating in Medicare have either doctors with admitting privileges on staff or a transfer agreement with a hospital. 84 Fed. Reg. 51732, 51733 (Sept. 30, 2019) (modifying 42 C.F.R. § 416.41(b)). CMS explained that "removing this requirement [was] necessary and appropriate" because of the burdens it imposed and because transfer agreements are not a "necessary or effective method" to promote communication between ASCs and hospitals. *Id.* at 51738. CMS also noted that federal law "has rendered these transfer [agreements] . . . obsolete and unnecessary," *id.* at 51790, by requiring that emergency medical centers participating in Medicare treat all patients without regard to whether such an agreement is in place, 42 U.S.C. § 1395dd. *See also June Med. Servs.*, 140 S. Ct. at 2132 (plurality opinion) (citing updated regulation for the proposition that "[u]nder modern procedures, emergency responders . . . take patients to hospital emergency rooms without regard to prior agreements between particular physicians and particular hospitals").

In light of this wealth of evidence, a straightforward application of the Supreme Court's decisions in *June Medical Services* and *Whole Woman's Health* confirms that the district court's finding that KRS § 216B.0435 and 902 KAR 20:360 § 10 "provide no meaningful benefit to women's health" is not clearly erroneous. *EMW v. Glisson*, 2018 WL 6444391, at \*19. In both of these cases, the Supreme Court upheld the district court's nearly identical finding—that the laws at issue did not advance the State's legitimate interest in protecting women's health—based on nearly identical evidence. *June Med. Servs.*, 140 S. Ct. at 2130–32 (plurality opinion); *Whole Woman's Health*, 136 S. Ct. at 2311, 2315–16. In *June Medical Services*, the Court concluded that "expert and lay testimony presented at trial" sufficiently supported the district court's findings that abortion complications are rare, usually not serious, and generally do not require transfer to a hospital or emergency room and that no evidence suggests Louisiana's law caused better outcomes for patients. 140 S. Ct. at 2131–32 (plurality opinion). In *Whole Woman's Health*, the Court concluded that the district court's findings were well-grounded in "peer-reviewed studies" and "[e]xpert testimony" showing that "abortions taking place in an abortion facility are safe," that abortion complications typically arise—if at all—only days after the abortion, that abortion "complications rarely require hospital admission, much less immediate

transfer to a hospital from an outpatient clinic," and that "the quality of care that a patient receives [was] not affected by" the requirements at issue. 136 S. Ct. at 2311, 2315 (quotation omitted). In both cases, the Court found it significant that the State, like Inspector General Silverthorn here, could not identify a single instance in which its requirements "would have helped even one woman obtain better treatment." *Id.* at 2311–12; *June Med. Servs.*, 140 S. Ct. at 2132 (plurality opinion). Thus, the district court's finding that KRS § 216B.0435 and 902 KAR 20:360 § 10 "provide no meaningful benefit to women's health" is, at a minimum, a permissible view of the evidence, and is not clearly erroneous.

**C. Balancing**

As the previous analysis shows, the district court did not clearly err in finding either that Kentucky's transfer and transport agreement requirement imposes unbearable burdens by "virtually assuring that abortion facilities will not operate in Kentucky" or that it provides "no meaningful benefit to women's health." *EMW v. Glisson*, 2018 WL 6444391, at *19. All that is left for this Court to do, under binding law, is to balance these burdens and benefits. Once again, the Supreme Court's decision in *Whole Woman's Health* and the plurality's opinion in *June Medical Services* clearly dictate the outcome of that balancing. The "virtual absence of any health benefit," when balanced against a substantial obstacle in the path of an individual's right to abortion access, constitutes an undue burden on abortion access, in violation of the Fourteenth Amendment to the United States Constitution. *Whole Woman's Health*, 136 S. Ct. at 2313; *accord June Med. Servs.*, 140 S. Ct. at 2132 (plurality opinion). Accordingly, KRS § 216B.0435 and 902 KAR 20:360 § 10 impose an undue burden on abortion access, in violation of the Fourteenth Amendment to the United States Constitution. Because *Whole Woman's Health* continues to bind this Court—even post-*June Medical Services*—this Court must affirm.**[17]**

---

**[17]**The parties discuss at length the binding or persuasive weight of this Court's opinion in *Women's Medical Professional Corp. v. Baird*. In that case, this Court upheld Ohio's requirement that abortion facilities enter into transfer agreements with local hospitals. 438 F.3d at 609. Defendants go so far as to argue that *Baird* stands for the proposition that no transfer agreement requirement can ever constitute an undue burden. However, *Baird* was decided before *Whole Woman's Health* clarified the balancing analysis that the undue burden test requires. Accordingly, *Baird* made no mention of the benefits, or lack thereof, of transfer agreements to women's health, and instead focused solely on the burdens their requirement would impose. Indeed, Defendants concede this point. Thus, *Baird* does not figure in this analysis.

**III.**

KRS § 216B.0435 and 902 KAR 20:360 § 10 are clearly unconstitutional under *Whole Woman's Health*.   However, even if the majority is correct in interpreting dicta from Chief Justice Roberts' concurring opinion in *June Medical Services* as effectively overruling *Whole Woman's Health*, KRS § 216B.0435 and 902 KAR 20:360 § 10 also clearly constitute an undue burden on abortion access under the standards set forth in that opinion. As previously discussed, under the undue burden analysis as Chief Justice Roberts would reconceptualize it, even if a law is "'reasonably related' to a legitimate state interest," it is unconstitutional if it presents a substantial obstacle to abortion access.   *June Med. Servs.*, 140 S. Ct. at 2135 (Roberts, C.J., concurring) (quoting *Casey*, 505 U.S. at 878).   KRS § 216B.0435 and 902 KAR 20:360 § 10 clearly fail this test.

This Court need not consider whether Kentucky's requirement is reasonably related to its asserted interest in promoting women's health in order to affirm.   Indeed, while Chief Justice Roberts discussed that standard, he did not apparently apply it in considering Louisiana's admitting privileges requirement.   *See* 140 S. Ct. at 2135, 2138 (Roberts, C.J., concurring).   As it happens, I question whether KRS § 216B.0435 and 902 KAR 20:360 § 10 could meet this test. The majority elaborates upon Chief Justice Roberts' opinion, suggesting that under this test, a law need not "'be in every respect logically consistent with its aims' to be reasonably related to a legitimate government interest," and that instead, it is enough that "there is a problem 'at hand for correction' and 'it might be thought that the particular legislative measure was a rational way to correct it.'" *Ante* at 24 (quoting *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487–88 (1955)).   Even accepting for the sake of argument that this is a correct articulation of the threshold test, the district court's findings suggest that in this case there was no "evil at hand for correction." *Williamson*, 348 U.S. at 488.   That is, "there was no significant health-related problem that the new law helped to cure." *EMW v. Glisson*, 2018 WL 6444391, at *25 (quoting *Whole Woman's Health*, 136 S. Ct. at 2311).   As the district court concluded, "abortion procedures performed in Kentucky are safe." *Id.* at *24.   "[T]here [was] no evidence in the record that any complications from abortions performed in Kentucky have been treated improperly in even one instance . . . ." *Id.*   And there was no evidence that a lack of transfer or

transport agreements ever resulted in improper care to any Kentucky women. *Id.* The majority says that the fact that "it is *sometimes* necessary to transfer a patient from an abortion facility to an emergency room because of an abortion-related complication" shows that there is a problem to address. *Ante* at 25. But as discussed previously, given the district court's findings that this transfer can be accomplished without any agreement, this is not a problem requiring correction.

Even if there had been a problem to solve, the district court's analysis suggests that Kentucky's transfer and transport agreement requirement could not be thought "a rational way to correct it." *Williamson*, 348 U.S. at 488. "[A]ll reasonable inferences drawn from the facts" presented to the court, it concluded, confirmed that "the transfer and transport agreements required by Kentucky law provide virtually no health benefits to women." *EMW v. Glisson*, 2018 WL 6444391, at *24. And while the majority asserts that a law may not need to be "in every respect" logically consistent with its aims, it must be logically consistent with those aims in *some* respect. *See Williamson*, 348 U.S. at 487–88. Here, the district court found that Kentucky's requirement "[is] not medically necessary and do[es] absolutely nothing to further the health and safety of women seeking abortions in the Commonwealth of Kentucky." *EMW v. Glisson*, 2018 WL 6444391, at *25. As previously established, the district court did not err in so finding.

In any event, regardless of whether Kentucky's transfer and transport agreement requirement is reasonably related to a legitimate state interest, it undoubtedly presents a substantial obstacle to abortion access. As Chief Justice Roberts explained in *June Medical Services*, that a law imposes a substantial obstacle is sufficient to render it unconstitutional. 140 S. Ct. at 2139 (Roberts, C.J., concurring). Chief Justice Roberts observed that Louisiana's admitting privileges law "would restrict women's access to abortion to the same degree as Texas's law" considered in *Whole Woman's Health*, and therefore was also unconstitutional. *Id.* at 2139. In Texas, the law caused twenty of the state's forty facilities providing abortion to stop doing so; in Louisiana, the law caused the number of abortion clinics to drop from three to one or two and the number of physicians providing abortion to drop from five to one or two. *Id.* at 2140. As previously discussed, this led to "fewer doctors, longer waiting times, and increased

crowding," as well as substantial travel distances for individuals seeking an abortion.**18**  *Id.* (quoting *Whole Woman's Health*, 136 S. Ct. at 2313).  As my earlier analysis demonstrated, in this case, the district court did not clearly err in concluding that Kentucky's requirement would cause both of the Commonwealth's two abortion clinics to cease providing abortions.  This is not just a substantial percentage drop in the number of clinics providing abortion—as in *Whole Woman's Health* and *June Medical Services*—but a wholesale elimination of those clinics.  This would also undoubtedly lead to "fewer doctors, longer waiting times, and increased crowding" at the few non-clinic facilities that do provide abortions.  *See id.*  Accordingly, Kentucky's requirement presents a substantial obstacle to abortion access and the district court's decision finding it unconstitutional must also be affirmed under Chief Justice Roberts' analysis.

This Court's holding in *Baird* does not affect this conclusion, even when applying this analysis.  As the Chief Justice explained, "the validity of . . . laws 'depend[s] on numerous factors that may differ from State to State,'" and "[w]hen it comes to the factual record, litigants normally start the case on a clean slate."  *Id.* at 2141 n.6 (first quoting *id.* at 2157 (Alito, J., dissenting); and then quoting *id.* at 2178 (Gorsuch, J., dissenting)).  Enforcement of the requirement at issue in *Baird* would have left several abortion facilities open in Ohio, 438 F.3d at 605, whereas in this case, enforcement of KRS § 216B.0435 and 902 KAR 20:360 § 10 would result in the closure of Kentucky's only remaining abortion facilities.  Thus, *Baird* is inapposite.

**IV.**

Having concluded that the district court correctly held KRS § 216B.0435 and 902 KAR 20:360 § 10 to be unconstitutional, one final issue should be considered.  Plaintiffs sought—and the district court granted—both facial and as-applied relief permanently enjoining the enforcement of this transfer and transport agreement requirement against any abortion facility.

---

**18**Notably, the majority says that this Court's precedent establishes that individuals face a substantial obstacle when they are "deterred from procuring an abortion as surely as if the [government] has outlawed abortion in all cases."  *Ante* at 17–18 (quoting *Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 370 (6th Cir. 2006) (alteration in original)).  As the above analysis shows, even under Chief Justice Roberts' interpretation, this is not the only situation in which an individual faces a substantial obstacle: such an obstacle also exists when the number of abortion providers drops substantially, such that demand for abortion exceeds supply, and individuals are forced to withstand consequences of that drop even short of being absolutely prevented from receiving an abortion.  *See June Med. Servs.*, 140 S. Ct. at 2139–40 (Roberts, C.J., concurring).

Defendants contend that facial relief was improper because the district court did not explicitly find that this requirement unduly burdens abortion access in "a large fraction of cases in which [the challenged law] is relevant." *Whole Woman's Health*, 136 S. Ct. at 2320 (emphasis omitted) (quoting *Casey*, 505 U.S. at 894–95).

Defendants' argument is unpersuasive. The district court found that EMW performed "almost all" of the "roughly 2,800" abortions Kentucky patients received in the Commonwealth in 2016. *EMW v. Glisson*, 2018 WL 6444391, at *25 (citing Trial Tr., R. 115 at PageID #4136 (Defendants' witness discusses reports showing that EMW performed 2,800 abortions in Kentucky in 2016, Planned Parenthood performed ten, a hospital performed three, and ASCs and private physicians' offices reported no abortions)); (*see also* Planned Parenthood Trial Ex. PX0052, Doc. No. 55 at A66 (showing that EMW provided 2,833 out of 2,848 abortions—or 99.47%—received by Kentuckians in the Commonwealth in 2016)). And as discussed above, the district court also found that that the enforcement of KRS § 216B.0435 and 902 KAR 20:360 § 10 will force EMW to close, such that it can no longer perform those abortions. *EMW v. Glisson*, 2018 WL 6444391, at *25. Thus, enforcing this requirement will altogether eliminate abortion access in upwards of 99% of the cases in which it is sought. This is by itself a large fraction of cases.

But in fact, the fraction of cases in which this restriction is "relevant" is still larger, because "the relevant denominator is 'those [women] for whom [the provision] is an actual rather than an irrelevant restriction.'" *Whole Woman's Health*, 136 S. Ct. at 2320 (alterations in original) (quoting *Casey*, 505 U.S. at 895); *accord June Med. Servs.*, 140 S. Ct. at 2132–33 (plurality opinion). Because KRS § 216B.0435 and 902 KAR 20:360 § 10 do not restrict abortions that occur at hospitals, ASCs, or physicians' offices, the transfer and transport agreement requirement is not relevant to them. And eliminating those abortions from the calculation, the fraction would rise to 100%. This is undoubtedly a large fraction. *See EMW v. Friedlander*, 960 F.3d at 809–10. Defendants counter that the individuals who would still be able to obtain an abortion at hospitals, ASCs, and physicians' offices in Kentucky or at abortion facilities in other states should be excluded from this fraction, because they purportedly would not encounter a substantial obstacle to abortion access. This is incorrect. "An obstacle is an

obstacle, regardless of whether some might be [able] to overcome it." *Id.* at 810. Even those individuals who may be able to obtain an abortion must deal with consequences of Kentucky's requirement, including "fewer doctors, longer waiting times, . . . increased crowding . . . [and] increased driving distances." *Whole Woman's Health*, 136 S. Ct. at 2313; *accord June Med. Servs.*, 140 S. Ct. at 2129–30 (plurality opinion); *id.* at 2140 (Roberts, C.J., concurring).

Because KRS § 216B.0435 and 902 KAR 20:360 § 10 impose an undue burden on all individuals seeking an abortion from an abortion facility in Kentucky, it is facially unconstitutional. Accordingly, the district court rightly granted Plaintiffs both facial and as-applied injunctive relief.

## CONCLUSION

Kentucky's requirement that abortion facilities enter into both a transfer agreement with a Kentucky-licensed acute-care hospital and a transport agreement with a Kentucky-licensed ambulance service constitutes an undue burden on abortion access in violation of the Fourteenth Amendment to the United States Constitution under any possible applicable test. Thus, this Court is compelled to affirm the district court's decision. The majority's decision to the contrary flies in the face of both the law and the facts. I therefore dissent.